No. 21-5592

# In the Supreme Court of the United States

———————

JOHN HENRY RAMIREZ,

*Petitioner,*

*v.*

BRYAN COLLIER, EXECUTIVE DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ET AL.,

*Respondents.*

———————

*ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE FIFTH CIRCUIT*

———————

**BRIEF *AMICUS CURIAE* OF THE
BECKET FUND FOR RELIGIOUS LIBERTY
IN SUPPORT OF PETITIONER**

———————

MICHAEL W. MCCONNELL
559 Nathan Abbott Way
Stanford, CA 94305

JOSHUA C. MCDANIEL
JAMES A. SONNE
HARVARD LAW SCHOOL
 RELIGIOUS FREEDOM CLINIC
1585 Massachusetts Ave.
Cambridge, MA 02138

ERIC C. RASSBACH
 *Counsel of Record*
LORI H. WINDHAM
CHRIS PAGLIARELLA
DANIEL L. CHEN
JAMES J. KIM
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Penn. Ave., NW
Suite 400
Washington, DC 20006
(202) 955-0095
erassbach@becketlaw.org

*Counsel for* Amicus Curiae

## QUESTIONS PRESENTED

The Court granted certiorari on the following questions:

1. Under the Free Exercise Clause and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5 (2000), does the State's decision to allow Ramirez's pastor to enter the execution chamber, but forbidding the pastor from laying his hands on his parishioner as he dies, substantially burden the exercise of his religion, so as to require the State to justify the deprivation as the least restrictive means of advancing a compelling governmental interest?

2. Under the Free Exercise Clause and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5 (2000), does the State's decision to allow Ramirez's pastor to enter the execution chamber, but forbidding the pastor from singing prayers, saying prayers or scripture, or whispering prayers or scripture, substantially burden the exercise of his religion, so as to require the State to justify the deprivation as the least restrictive means of advancing a compelling governmental interest?

ii

# TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED..........................................i

TABLE OF AUTHORITIES......................................iii

INTEREST OF THE *AMICUS CURIAE*...................1

INTRODUCTION AND SUMMARY
OF ARGUMENT.......................................................2

ARGUMENT...............................................................3

I. The Free Exercise Clause protects the right of
   condemned prisoners to engage in historical
   religious practices like audible clergy prayer
   and clergy touch at the time of execution. ...........3

   A. There is a historical religious practice of
       audible clergy prayer at the time of
       execution. ...........................................................3

   B. There is a historical religious practice of
       clergy touch at the time of execution. ...........15

   C. TDCJ's prohibition of historical religious
       practices triggers strict scrutiny under the
       Free Exercise Clause. ...................................20

II. Denying audible clergy prayer and clergy touch
   also triggers strict scrutiny under RLUIPA.......23

III.TDCJ cannot make out a successful strict
   scrutiny affirmative defense under either the
   Free Exercise Clause or RLUIPA. ......................25

IV.The Court can and should grant conditional
   relief to Ramirez..................................................30

CONCLUSION ........................................................32

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Israel of Am.* v. *Cuomo,*
   141 S.Ct. 889 (2020) ............................................ 22

*Alleyne* v. *United States,*
   570 U.S. 99 (2013) ............................................... 20

*Benning* v. *Georgia,*
   391 F.3d 1299 (11th Cir. 2004) ............................. 1

*Betterman* v. *Montana,*
   136 S.Ct. 1609 (2016) ......................................... 20

*Bucklew* v. *Precythe,*
   139 S.Ct. 1112 (2019) ......................................... 21

*Burwell* v. *Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ............................................ 23

*Caetano* v. *Massachusetts,*
   577 U.S. 411 (2016) ............................................ 17

*Carpenter* v. *United States,*
   138 S.Ct. 2206 (2018) ......................................... 20

*Church of the Lukumi Babalu Aye* v.
   *City of Hialeah,*
   508 U.S. 520 (1993) ....................................... 22, 23

*District of Columbia* v. *Heller,*
   554 U.S. 570 (2008) ............................................ 20

iv

*Dunn* v. *Smith*,
   141 S.Ct. 725 (2021) ......................................*passim*

*Employment Division* v. *Smith*,
   494 U.S. 872 (1990) ............................................. 23

*Financial Oversight & Mgmt. Bd. for*
   *P.R.* v. *Aurelius Inv., LLC*,
   140 S.Ct. 1649 (2020) ........................................ 20

*Fulton* v. *City of Philadelphia*,
   141 S.Ct. 1868 (2021) ........................................ 25

*Gonzales* v. *O Centro Espírita*
   *Beneficente União do Vegetal*,
   546 U.S. 418 (2006) ............................................ 25

*Grupo Mexicano de Desarrollo, S.A.* v.
   *Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ............................................ 30

*Gutierrez* v. *Saenz*,
   141 S.Ct. 1260 (2021) ........................................ 24

*Hill* v. *McDonough*,
   547 U.S. 573 (2006) ............................................ 32

*Holt* v. *Hobbs*,
   574 U.S. 352 (2015) ......................................*passim*

*Hosanna-Tabor Evangelical Lutheran*
   *Church & Sch.* v. *EEOC*,
   565 U.S. 171 (2012) ............................................ 21

*Kahler* v. *Kansas*,
   140 S.Ct. 1021 (2020) ........................................ 21

v

*Kerry* v. *Din*,
   576 U.S. 86 (2015) ................................................ 20

*Kyllo* v. *United States*,
   533 U.S. 27 (2001) ................................................ 17

*Lindsey* v. *Clark*,
   69 S.E.2d 342 (Va. 1952) ...................................... 31

*Liu* v. *SEC*,
   140 S.Ct. 1936 (2020) .......................................... 30

*M'Culloch* v. *Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ............................. 20

*Mast* v. *Fillmore County*,
   141 S.Ct. 2430 (2021) .......................................... 26

*McCullen* v. *Coakley*,
   573 U.S. 464 (2014) ............................................. 26

*Moussazadeh* v. *TDCJ*,
   703 F.3d 781 (5th Cir. 2012) ................................. 1

*Murphy* v. *Collier*,
   139 S.Ct. 1475 (2019) ...................................*passim*

*Murphy* v. *Collier*,
   423 F. Supp. 3d 355 (S.D. Tex. 2019) ............ 13, 18

*O'Lone* v. *Estate of Shabazz*,
   482 U.S. 342 (1987) ........................................22-23

*Oregon* v. *Ice*,
   555 U.S. 160 (2009) ............................................. 20

vi

*Our Lady of Guadalupe Sch.* v.
  *Morrissey-Berru,*
  140 S.Ct. 2049 (2020) ........................................... 22

*Petrella* v. *Metro-Goldwyn-Mayer, Inc.,*
  572 U.S. 663 (2014) ............................................. 30

*Ray* v. *Commissioner,*
  915 F.3d 689 (11th Cir. 2019) ............................. 18

*Rich* v. *Secretary,*
  716 F.3d 525 (11th Cir. 2013) ............................... 1

*Roman Catholic Diocese of Brooklyn* v.
  *Cuomo,*
  141 S.Ct. 63 (2020) ............................................. 22

*Smith* v. *Commissioner,*
  844 F.App'x 286 (11th Cir. 2021) ........................ 29

*Spratt* v. *Rhode Island Dep't of Corr.,*
  482 F.3d 33 (1st Cir. 2007) ................................. 27

*Taggart* v. *Lorenzen,*
  139 S.Ct. 1795 (2019) ......................................... 30

*Tandon* v. *Newsom,*
  141 S.Ct. 1294 (2021) ......................................... 22

*Town of Greece* v. *Galloway,*
  572 U.S. 565 (2014) .............................. 3, 17, 21, 23

*Turner* v. *Safley,*
  482 U.S. 78 (1987) .............................................. 22

*Wisconsin* v. *Yoder,*
  406 U.S. 205 (1972) ............................................ 22

vii

*Yellowbear* v. *Lampert*,
    741 F.3d 48 (10th Cir. 2014) ................................. 24

## Statutes

42 U.S.C. 2000cc-1(a) ................................................ 24

42 U.S.C. 2000cc-5(7)(A) .......................................... 24

Tex. Penal Code § 38.15 ........................................... 29

## Other Authorities

*Ames, Chafee & Re on Remedies: Cases
    and Materials* (Emily Sherwin &
    Samuel L. Bray, eds., 3d ed. 2019) ...................... 31

*An account of the behavior of Mr.
    William Talman*, Philadelphia
    Gazette, Aug. 3, 1791 ............................................. 8

Associated Press, *Man executed in
    Alabama: "I hope this brings closure"*,
    CBS News (Jan. 22, 2016)........................ 13, 18-19

Catechism of the Catholic Church ............................. 9

*Executions by State and Year*, Death
    Penalty Information Center................................. 18

*Execution of Clark*, Salem Gazette, May
    11, 1821.................................................................. 8

*Execution of Colonel Despard*, The
    Republican, Apr. 11, 1803...................................... 9

viii

*Execution of Donnelly*, Dover Gazette &
    Strafford Advertiser, Jan. 23, 1858 .................... 16

*Execution of the Halsted Murderer*,
    Milwaukee Sentinel, Jan. 29, 1872 .................... 16

*Execution of Joseph Clerk for the Murder
    of Policeman Gillespie*, Weekly
    Herald, Feb. 12, 1853 ......................................... 16

*Execution of the Spanish Pirates*,
    Washington Globe, June 16, 1835 ...................... 16

*Execution at the Tombs*, Weekly Herald,
    Jan. 28, 1854 ....................................................... 9

*Execution of Peter Mattocks in
    Philadelphia*, New York Herald, May
    26, 1856 ................................................................ 9

*The Gallows: Execution of a
    Philadelphia Murderer*, St. Louis
    Daily Globe-Democrat, June 13, 1877 ................ 16

*Joel Clough—The Execution*, National
    Intelligencer, Jul. 29, 1833 .................................. 16

*Letters and Papers, Foreign & Domestic,
    of the Reign of Henry VIII*, Part I
    (James Gairdner & R.H. Brodie, eds.,
    1903) ...................................................................... 4

Shorter Encyclopaedia of Islam (H.A.R.
    Gibbs & J.H. Kramers, eds., E.J.
    Brill 1961) ............................................................ 10

ix

Shulchan Arukh, *Orach Chayim* .............................. 10

StoryCorps, *Witness to an Execution*
(Oct. 20, 2000) ..................................... 13

U.S. Army, A.R. 633-15, Procedure for
Military Executions (Apr. 7, 1959) ..................... 11

U.S. Army, Pamphlet 27-4, Procedure
for Military Executions (Dec. 9, 1947)................ 11

Stuart Banner, *The Death Penalty: An
American History* (2009) ............................... 5, 6, 7

John Blume, *Killing the Willing:
"Volunteers," Suicide and
Competency*, 103 Mich. L. Rev. 939
(2005) .................................................. 19

4 *Boswell's Life of Johnson* (George
Birkbeck Hill & L. F. Powell eds.,
Oxford 1934) ........................................ 27

Samuel L. Bray, *Remedies, Meet
Economics; Economics, Meet
Remedies*, 38 Oxford J. of Legal
Studies 71 (2018)................................. 31

Kim Chandler, *Alabama: Pastor can
hold inmate's hand during execution*,
Associated Press (Sept. 9, 2021) ......................... 19

Daniel A. Cohen, *Pillars of Salt,
Monuments of Grace* (2006) ............................... 7-8

x

Pamela Colloff, *The Witness*, Texas
    Monthly (Sept. 2014)............................................. 18

Davison M. Douglas, *God and the*
    *Executioner: The Influence of Western*
    *Religion on the Use of the Death*
    *Penalty*, 9 Wm. & Mary Bill Rts. J.
    137 (2000) ............................................................. 8

Chaplain Henry F. Gerecke, *I Walked to*
    *the Gallows With the Nazi Chiefs*,
    The Saturday Evening Post, Sept. 1,
    1951....................................................................... 11

James Guthrie, *Ordinary's Account*
    (Nov. 21, 1743)........................................... 4, 15-16

John D. Heydon, Mark J. Leeming &
    P.G. Turner, *Meagher, Gummow &*
    *Lehane's Equity: Doctrines &*
    *Remedies* (5th ed. 2015) ...................................... 31

Bob Johnson, *Inmate in 2005 killing put*
    *to death*, Gadsden Times (Jul. 25,
    2013) .............................................................. 13, 19

Samuel Johnson, *The necessity of*
    *proportioning punishments to crimes*,
    The Rambler, No. 114, April 20, 1751................ 27

Fr. John C. Kasza, *Understanding*
    *Sacramental Healing (Anointing and*
    *Viaticum)* (2007)................................................... 9

Damien Keown, *Oxford Dictionary of*
    *Buddhism* (2004)................................................. 10

xi

Walter C. Long, *The Constitutionality and Ethics of Execution-Day Prison Chaplaincy*, 21 Tex. J. C.L. & C.R. 1 (2015) .................................................... 18

William DeLoss Love, *Samson Occom and the Christian Indians of New England* (1899) ....................................................... 6

Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture, 1776-1865* (1989) ................................. 8-9

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ................................... 22

Michael W. McConnell, *Reflections on Hosanna-Tabor*, 35 Harv. J.L. & Pub. Pol'y 821 (2012) .................................... 23

Randall McGowen, *The Body and Punishment in Eighteenth-Century England*, 59 J. Mod. Hist. 651 (1987) .................... 5

Andrea McKenzie, *Tyburn's Martyrs* (2007) ................................................................ 4, 9

Mary Milz, *The nun of death row stands against the death penalty while providing spiritual companionship to the condemned*, NBC WTHR 13 (Dec. 17, 2020) ............................................................ 14

xii

John Norton Pomeroy, 1 *Pomeroy's Equity Jurisprudence* (3d ed. 1905).....................31

Mark Pratt, *South Carolina inmate is nation's 500th execution since 1977*, Associated Press, Dec. 19, 1998...........................14

Dick Reavis, *Charlie Brooks' Last Words*, Texas Monthly (Feb. 1983)................13, 27

Via Ryckaert et al., *Wesley Ira Purkey executed in Terre Haute*, Indianapolis Star, July 16, 2020 ...............................................14

Dennis Shere, *Warden saw only one answer for troubled La. Prison: Christ*, Baptist Press (Jan. 3, 2008) ....................19

Kevin Simpson, *In 1997, Colorado's first execution in 30 years marked a watershed moment*, Colorado Sun (Mar. 4, 2019) ..................................................13-14

Samuel Smith, *Ordinary's Account* (June 16, 1693) .....................................................15

Jacqueline I. Stone, *By the Power of One's Last Nenbutsu: Deathbed Practices in Early Medieval Japan*, in Approaching the Land of Bliss (Richard K. Payne & Kenneth K. Tanaka, eds. 2004) ...............................................10

xiii

Lynn Waltz, *Death Walk Chaplain Russ Ford Has Accompanied 19 Condemned Murderers to Virginia's Electric Chair*, The Virginian-Pilot, Aug. 28, 1994.................................................. 12, 17

George Washington, General Orders (June 9, 1777), reproduced in Founders Online, National Archives................. 6-7

George Washington, General Orders (May 1, 1780), reproduced in Founders Online, National Archives.................... 7

George Washington, Proclamation of Pardon (May 26, 1780) reproduced in Founders Online, National Archives.................... 7

## INTEREST OF THE *AMICUS CURIAE*[1]

The Becket Fund for Religious Liberty is a nonprofit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. It has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Native Americans, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country and around the world.

Becket has often defended prisoners' exercise of religion, including against the Respondent here. See, *e.g.*, *Holt* v. *Hobbs*, 574 U.S. 352 (2015) (beard for Muslim prisoner); *Rich* v. *Secretary*, 716 F.3d 525, 534 (11th Cir. 2013) (kosher diet for Jewish prisoner); *Moussazadeh* v. *TDCJ*, 703 F.3d 781, 784 (5th Cir. 2012) (same); *Benning* v. *Georgia*, 391 F.3d 1299, 1302 (11th Cir. 2004) (same). It has also filed as amicus in emergency-docket applications regarding death-chamber clergy access. See *Dunn* v. *Smith*, 141 S.Ct. 725 (2021); *Murphy* v. *Collier*, 139 S.Ct. 1475 (2019).

As an organization focused solely on religious liberty, Becket takes no position on the administration of the death penalty in general or Ramirez's crime in particular. Becket instead submits this brief to explain that the presence of clergy at executions—and their ability to pray aloud for and touch the condemned—is an ancient religious practice that our Constitution and laws protect from arbitrary government interference.

---

[1] No counsel for a party authored any portion of this brief or made any monetary contribution intended to fund its preparation or submission. All parties have consented to the filing of this brief.

2

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

This case might be difficult if the religious practices the Texas Department of Criminal Justice forbids—audible clergy prayer and clergy touch at the time of execution—were novel or historically unusual. But just the opposite is true. Our Nation has an unbroken history of allowing these very practices before, during, and after the Founding. Indeed, if an ounce of history is worth a pound of doctrine, here there are pounds of history on offer—from the executions of deserters during the Revolutionary War, to the "execution sermons" of Cotton Mather, to the Army executions of Nazi war criminals after the Nuremberg Trials, and the practice of many states (including Texas) until the present day.

As we explain below, the religious exercises at issue—audible clergy prayer and clergy touch—both stand at the center of the "historical practices and understandings" that define the Free Exercise right with respect to clergy access for the condemned. And just as historical practices and understandings guide the courts in interpreting most other parts of the Bill of Rights, including the other Religion Clause, those historical practices and understandings definitively show that the religious exercises here lie at the heart of the Free Exercise protection, triggering strict scrutiny. That protection is complemented by RLUIPA, which independently triggers strict scrutiny under *Holt* v. *Hobbs*.

The strict scrutiny analysis is similarly straightforward. TDCJ offers no reason why other States—now including Alabama—can accommodate audible clergy prayer and clergy touch, but it cannot.

3

That means its policy fails strict scrutiny. Indeed, until recently TDCJ itself allowed both audible clergy prayer and clergy touch, and TDCJ can give no convincing reason why it must forbid them now.

Finally, conditional relief—requiring meaningful clergy access as a condition of carrying out an execution—lies squarely within the federal courts' equitable powers. Although not all claims will be meritorious, here there is no manipulation or delay, so Petitioner should be granted conditional relief.

## ARGUMENT

## I. The Free Exercise Clause protects the right of condemned prisoners to engage in historical religious practices like audible clergy prayer and clergy touch at the time of execution.

In *Town of Greece* v. *Galloway*, the Court recognized that whatever other test might apply, "the Establishment Clause must be interpreted by reference to historical practices and understandings." 572 U.S. 565, 576 (2014) (cleaned up). The same can be said of the Free Exercise Clause. As we show below, both religious exercises Ramirez seeks at the time of death—audible clergy prayer and clergy touch—are "historical practices" that enjoy protection under the Free Exercise Clause.

### A. There is a historical religious practice of audible clergy prayer at the time of execution.

The historic record unequivocally demonstrates that "historical practices and understandings" of religious exercise encompass audible clergy prayer—

4

from a minister of the prisoner's choice—at the time of execution.

1. In England and her colonies, the practice of audible spiritual guidance (or other audible rituals) in the final moments before death long predated and continued through the Founding. The "Visitor of Newgate" or "Ordinary of Newgate," an early prison chaplain, was first appointed in 1544 and was charged with ministering to the prisoners in Newgate Prison. His duties included accompanying the condemned to Tyburn Gallows, where he would stand in the cart[2] together with the condemned immediately before the execution took place, and would pray for the condemned. 19 *Letters and Papers, Foreign & Domestic, of the Reign of Henry VIII*, Part I at 501 (James Gairdner & R.H. Brodie, eds., 1903); Andrea McKenzie, *Tyburn's Martyrs* 10-14 (2007). Although the Ordinary was an Anglican cleric, Nonconformists, Catholics, Jews, and others were eventually accommodated, both at Newgate and at Tyburn; the "policy of religious toleration at Newgate was by the 1740s referred to as a custom of long standing[.]" McKenzie 179. For example, according to the "custom of the kingdom," in 1743 Jewish prisoner Abraham Pass "was allowed, as is usual in those cases, out of Charity to such miserable Creatures in their last Moments, that they may not be put to any Confusion or Uncertainty, to allow them Clergy of their own Communion." James Guthrie, *Ordinary's Account* 10 (Nov. 21, 1743), https://perma.cc/9CX4-F39H.

---

[2] Before 1783, the condemned stood in a cart underneath the gallows, and died "after the cart upon which they stood was drawn away." McKenzie 16.

5

"[I]n the seventeenth and eighteenth centuries," capital punishment was understood "to facilitate the criminal's repentance," with the theological idea that "d[ying] in the proper frame of mind" could determine "one's eternal fate." Stuart Banner, *The Death Penalty: An American History* 16 (2009). For that reason, ministers would constantly be "instruct[ing]," "direct[ing]," and "pray[ing] with" the condemned up until death. *Id.* at 18; see, *e.g.*, Randall McGowen, *The Body and Punishment in Eighteenth-Century England*, 59 J. Mod. Hist. 651, 651 (1987) ("The condemned * * * were accompanied by a clergyman who shadowed their last moments urging them to repent or consoling them with the offer of divine forgiveness.").

In one of the most famous executions in English history—the regicide of Charles I in 1649—the King was ministered to on the scaffold by William Juxon, the (then-deposed) Bishop of London. The seventeenth-century depiction of the execution set forth below prominently features Bishop Juxon in black, receiving final gifts from a standing Charles I before he lays his head upon the block:

6



National Portrait Gallery (London, UK), https://perma.cc/P9LV-L8N8.

2. American history also manifests a consistent practice of audible clergy prayer. Colonial press described clergy "attend[ing] the Criminal to the Place of Execution" and providing a "well adapted Prayer to the Occasion." New London Gazette, Sept. 11, 1772, reprinted in William DeLoss Love, *Samson Occom and the Christian Indians of New England* 173-174 (1899). William Smith's 1791 guidebook for ministers, *The Convict's Visitor*, noted in its subtitle that it offered "*suitable devotions before, and at the time of Execution*" in order to provide guidance for this "routine" ministry. Banner 18 (italics in original).

The founding generation was very familiar with these practices—including allowing the prisoner to choose the clergyman—not least due to their experiences during the Revolution. For example, General Washington ordered that "prisoners under sentence of death" "be attended with such Chaplains, as they choose" at their "execution, to morrow at 12 o'clock." George Washington, General Orders (June 9, 1777), reproduced in Founders Online, National

7

Archives, https://perma.cc/XU7H-XXUV.

Numerous primary sources describe deserters sentenced to death under General Washington as being ministered to by clergy praying aloud at the execution. See, *e.g.*, George Washington, General Orders (May 1, 1780), reproduced in Founders Online, National Archives, https://perma.cc/K6MM-W4NQ (appending report of Pennsylvania Evening Post reporting how "the attending chaplain * * * prayed and recommended [the criminals] severally to God" before the first "was fixed to the gallows"). In another case, General Washington approved a sentence of death against a number of prisoners, and had ordered the execution to proceed. The chaplain then "attended them to the gallows, [and] addressed them" on "the justice of their sentence, and the high importance of a preparation for death." George Washington, Proclamation of Pardon (May 26, 1780) reproduced in Founders Online, National Archives, https://perma.cc/Y9U3-WK58 (appendix). "At this awful moment, while their fervent prayers are ascending to Heaven, an officer comes forward and reads a reprieve for seven of them, by the commander-in-chief." *Ibid.*

Early American executions by hanging were typically a public spectacle, and it was common for ministers to continue to "le[a]d prayers" for the condemned, and for those assembled to watch, right up until the condemned person was hanged. Banner 159.

Cotton Mather, Benjamin Colman, and other "notable[]" Puritan ministers assisted in the early spread of this practice—the "execution sermon"— which itself developed from the English "gallows sermons" before it. Daniel A. Cohen, *Pillars of Salt,*

8

*Monuments of Grace* 3-5 (2006).[3] These sermons delivered "at the gallows" sometimes consisted not only of telling the prisoner "to put all his trust in the mercy of God" and delivering public "word[s] of exhortation," but even in singing "a few verses" of hymns at death. *An account of the behavior of Mr. William Talman*, Philadelphia Gazette, Aug. 3, 1791 (first-person recollection by New Jersey minister on "addressing the multitude" and ministering to the condemned at an execution).

Press reports through the 1800s attest to this continued public practice. For example, Stephen Clark—hanged in Massachusetts in 1821 for arson—was permitted to select two clergymen "for his spiritual confessors, who continued to the last their benevolent and pious endeavours to give him a just view of his deplorable condition." *Execution of Clark*, Salem Gazette, May 11, 1821. The clergymen "ascended the scaffold" alongside Clark, and both addressed the crowd in prayer before one prayed "in most appropriate and affecting terms" with Clark alone, "and the scene soon closed forever!" *Ibid.*

Antebellum-era newspapers from Pennsylvania and New York persistently mention the presence of a minister alongside the condemned on the gallows, "offer[ing] a prayer as the prisoner wept" or praying

---

[3] Increase Mather, Cotton's father and President of Harvard College, was notably among those using "execution sermons" to "urg[e] repentance" of both "the condemned and * * * the community" and "convey[] the social and religious meaning of the execution." Davison M. Douglas, *God and the Executioner: The Influence of Western Religion on the Use of the Death Penalty*, 9 Wm. & Mary Bill Rts. J. 137, 156 & n.96 (2000).

9

alongside. Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture, 1776-1865* 93 (1989); see, *e.g.*, *Execution at the Tombs*, Weekly Herald, Jan. 28, 1854 (New York execution where condemned "entered into a fervent prayer in a low tone with the priest" below "the fatal beam"); *Execution of Peter Mattocks in Philadelphia*, New York Herald, May 26, 1856 (pastor spoke aloud on scaffold before prisoner's last words and hanging).

3. While the British Empire's practices—from which the American Colonies' practices derived— reflected a Protestant tradition, other religious traditions also incorporated audible prayer at death, even from before the Founding. For example, Catholic practices that have accompanied death for over a millennium are well-known to involve speech and action. The priest audibly prays "the liturgy of Viaticum" that "the Lord Jesus Christ protect you and lead you to eternal life." Fr. John C. Kasza, *Understanding Sacramental Healing (Anointing and Viaticum)* 223 (2007); see Catechism of the Catholic Church §§ 1501-1502, 1524-1525 (discussing viaticum and the effect of expected death on discernment). These rituals are also performed for those condemned to die. Remarkably, Catholic prisoners were allowed these practices even before the Catholic religion attained full toleration in Britain, showing just how fundamental this right was. See, *e.g.*, McKenzie 176-182; *Execution of Colonel Despard*, The Republican, Apr. 11, 1803 (among six prisoners, "Macnamara being a Roman Catholic, was attended by a Roman Catholic Priest," and on the scaffold, "Macnamara prayed earnestly with the Clergyman of his own persuasion," before clergy "shook hands with each of them").

10

Similarly, the ancient branch of Buddhism called Pure Land Buddhism—at issue in *Murphy* v. *Collier*—has long emphasized the "vital role" of those ministering to the dying in "guiding deathbed reflection and repentance, and chanting the *nenbutsu*," a key oral invocation (also transliterated *nembutsu*). Jacqueline I. Stone, *By the Power of One's Last Nenbutsu: Deathbed Practices in Early Medieval Japan*, in Approaching the Land of Bliss 84 (Richard K. Payne & Kenneth K. Tanaka, eds. 2004); see "Namu Abida Butsu," Damien Keown, *Oxford Dictionary of Buddhism* (2004), https://perma.cc/C5J3-P2XU (describing the "nembutsu or oral invocation" chanted "in order to gain rebirth"). This belief in the "radical salvific power of one's last nenbutsu" follows the faith's understanding that *rinju shonen*—"right mindfulness at the last moment"—is essential to salvation. Stone 77; see *Murphy*, 139 S.Ct. at 1484 (Alito, J., dissenting) (observing Murphy's belief "that he will be reborn in the Pure Land only if he succeeds in remaining focused on Buddha while dying and that the chants of a Buddhist priest will help him in this endeavor").

Similarly, some other non-Christian traditions have long taught that certain prayers *must* be audible. See, *e.g.*, Shulchan Arukh, *Orach Chayim* 62:3, 101:2 (certain Jewish prayers must be said aloud, though in a way designed not to disrupt other congregants); *Ṣalāt,* Shorter Encyclopaedia of Islam (H.A.R. Gibbs & J.H. Kramers, eds., E.J. Brill 1961) 493 (some daily prayers must be said aloud).

4. In the era of modern executions, audible clergy prayer with and on behalf of the condemned continued. After World War II, Army procedures

11

directed that "[i]n all executions, a chaplain of the prisoner's choice will be provided if practicable" and would be made available to the prisoner "at all times after the prisoner [was] notified of the time of execution." U.S. Army, Pamphlet 27-4, Procedure for Military Executions, § I.9. (Dec. 9, 1947); U.S. Army, A.R. 633-15, Procedure for Military Executions, § I.6 (Apr. 7, 1959). For each type of execution, the chaplain was to "accompany the prisoner." 1947 Procedure, §§ II.13.*d.*, III.16.*c.*; 1959 Procedure, §§ II.10.*d.*, III.13.*c.*, IV.18.*c.*

For hanging, "the chaplain preced[ed] the prisoner" onto the gallows and left only upon pronouncement of death. 1947 Procedure, §§ III.18.*e*, III.19.*b*. For electrocution, the chaplain remained "in[] the execution chamber" through the execution. 1959 Procedure, § IV.20.*b*. And for "musketry," the chaplain would "proceed directly to the prisoner's post" and only "retire to the flank" immediately before the shooting. 1947 Procedure, §§ II.14.*f.*, II.15.*a*. In all of these, the officer in charge would allow a "reasonable time" immediately before execution for the chaplain and prisoner together to exchange "any last statement." See 1959 Procedure, §§ II.12.*a.*, III.16.*a.*, IV.20.*b*.

And in the executions of Nazi war criminals conducted by the United States Army following World War II, including the Nuremberg Trials, chaplains accompanied the condemned to the place of execution and "spoke" aloud prayers just before they "dropped through the trap door." Chaplain Henry F. Gerecke, *I Walked to the Gallows With the Nazi Chiefs*, The Saturday Evening Post, Sept. 1, 1951. Contemporary photographs depict the scene:

12



National Archives, Office of Chief of Counsel for War Crimes, Execution at Landsberg Prison.

The United States government thus ensured that even those who committed crimes against humanity or war crimes heard audible clergy prayer—not because of who the war criminals were, but because of who Americans are.

More recently, in Virginia, the death row chaplain would stand beside the condemned prisoner as he was strapped down, offering final prayers and spiritual guidance. See Lynn Waltz, *Death Walk Chaplain Russ Ford Has Accompanied 19 Condemned Murderers to Virginia's Electric Chair*, The Virginian-Pilot, Aug. 28, 1994 (minister urged one prisoner "to move ahead into the next life" and told another "there was a part of him that would never die," immediately before the "roar of electricity").

13

5. In fact, until the dispute in *Murphy*, TDCJ itself—for decades, and from the very start—allowed audible clergy prayer at lethal injection executions. See, *e.g.*, Dick Reavis, *Charlie Brooks' Last Words*, Texas Monthly (Feb. 1983), https://perma.cc/KM2N-3GUD (describing imam's and prisoner's audible prayer in execution chamber during Texas's first lethal injection); StoryCorps, *Witness to an Execution* (Oct. 20, 2000), https://perma.cc/4XFJ-3L8X, at 16:00 (audio of Rev. Carroll Pickett discussing prayer, counseling, and other "conversations" provided in the last "probably forty-five seconds" for various inmates in the Texas execution chamber by the chaplain). In the parallel *Murphy* litigation, TDCJ chaplains have echoed these press reports and first-hand accounts. See 6/24/19 Brouwer Tr. at 30:25-31:6, *Murphy* v. *Collier*, 423 F. Supp. 3d 355 (S.D. Tex. 2019) (No. 19-1106), ECF 38-6 (chaplain Thomas Brouwer stating that TDCJ chaplains could "pray with" and "read passages from the Bible" aloud to prisoners in the chamber); 6/24/19 Jones Tr. at 24:15-20, *Murphy* v. *Collier*, (No. 19-1106), ECF 38-4 (chaplain Timothy Jones confirming prayer with prisoners was permitted).

Other states have also long allowed audible clergy prayer. Bob Johnson, *Inmate in 2005 killing put to death*, Gadsden Times (Jul. 25, 2013), https://perma.cc/WY6R-2FXR (chaplain "knelt beside Lackey and prayed quietly" as the drugs ran); Associated Press, *Man executed in Alabama: "I hope this brings closure"*, CBS News (Jan. 22, 2016), https://perma.cc/Z24D-ZC5X ("A prison chaplain held Brooks' hand and appeared to pray with him as the first drug, a sedative, began flowing."); Kevin

14

Simpson, *In 1997, Colorado's first execution in 30 years marked a watershed moment*, The Colorado Sun (Mar. 4, 2019), https://perma.cc/CAR2-QBNQ (recording the "priest pray[ing] beside [Gary Lee] Davis" as the chemicals entered his body). Cf. Mark Pratt, *South Carolina inmate is nation's 500th execution since 1977*, Associated Press, Dec. 19, 1998 ("Before the curtain was drawn on the death chamber, witnesses could hear Smith, his lawyer and two chaplains singing 'Amazing Grace' as they walked through the corridor.").

And contrary to TDCJ's insistence that its flat prohibition on speaking is analogous to federal practice, multiple federal executions that took place last year (after a long moratorium) featured audible prayer. See, *e.g.*, Mary Milz, *The nun of death row stands against the death penalty while providing spiritual companionship to the condemned*, NBC WTHR 13 (Dec. 17, 2020), https://perma.cc/P8YT-L4XB (Catholic nun "softly recit[ed] the Divine Mercy Chaplet" in execution chamber in response to prisoner's request "to pray it out loud with him"); Via Ryckaert et al., *Wesley Ira Purkey executed in Terre Haute*, Indianapolis Star, July 16, 2020, https://perma.cc/Q467-T7EU (describing chaplain "with his hands before his face in prayer" within the chamber in federal execution).

In short, audible clergy prayer at the time of execution follows a centuries-long tradition predating the Founding, and is supported by millennia-old religious practices of many faiths across the world. Those historical practices and understandings confirm that audible clergy prayer at the time of execution falls

15

well within the protective ambit of the Free Exercise Clause.

## B. There is a historical religious practice of clergy touch at the time of execution.

Clergy touch at the time of execution is also a historical religious practice and thus protected by the Free Exercise Clause.[4]

1. Physical touch stands within a tradition of historical practice that has evolved in light of new technological developments. For most of Anglo-American legal history, the methods of execution employed made it physically impossible for the clergy member to touch the condemned person at the exact moment of death. Hanging, firing squad, electrocution, and the gas chamber all made touch at the exact moment of death infeasible. Yet even with respect to these methods of execution, clergy typically engaged in physical touch up to the last moment. The Ordinary of Newgate's *Accounts* contain numerous examples. In 1693, at the execution of William Anderton, "*Anderton* desired that his Brother, and a Minister, his Friend, might come into the Cart, which was granted." Samuel Smith, *Ordinary's Account* 2 (June 16, 1693), https://perma.cc/T9FN-NU8K. Similarly, at the execution of Abraham Pass, fellow Jews crowded so closely around him at Tyburn that the Ordinary could not make his way into the cart: "At the Place of Execution, he appeared very Serious and concerned, I

---

[4] *Amicus* employs the word "touch" rather than "laying on of hands" to avoid confusion with other religious practices, such as Catholic or Protestant ordination, or Jewish *semicha*, that involve the placing of hands on someone else.

16

prayed for him, and was willing to have read either some suitable Chapters or Psalms, but he was invested with so many Jews, that there could be no Ground gained upon him." Guthrie 11.

American reports are likewise filled with examples of touching. See, *e.g.*, *Joel Clough—The Execution*, National Intelligencer, Jul. 29, 1833 (condemned "ascended the scaffold * * * arm in arm with the Bishop" and clergy continued "[r]eligious exercises" before "embrac[ing] him" prior to his "launch[] into eternity"); *Execution of the Spanish Pirates*, Washington Globe, June 16, 1835 ("As the cap was about to be drawn over [the prisoner's] face, the Spanish priest fervently embraced him * * * ."); *Execution of Joseph Clerk for the Murder of Policeman Gillespie*, Weekly Herald, Feb. 12, 1853 ("The attendant priest embraced and kissed the unfortunate man most affectionately[,]" after "read[ing] aloud a fervent prayer" on the gallows); *Execution of Donnelly*, Dover Gazette & Strafford Advertiser, Jan. 23, 1858 (New Jersey murderer "embraced" two priests "about the scaffold," and prayed aloud and "kiss[ed] reverently the crucifix" on priests' prompting); *Execution of the Halsted Murderer*, Milwaukee Sentinel, Jan. 29, 1872 ("Up to the last moment he held his hand in that of Mr. Week, the Prison Chaplain" who had just finished his pronouncements from the scaffold); *The Gallows: Execution of a Philadelphia Murderer*, St. Louis Daily Globe-Democrat, June 13, 1877 (chaplain "partially embraced the doomed man" on "the scaffold," "grasped his hand warmly, and said, 'Good-by, George; you are going home to God'").

17

Indeed, accounts show that clergy attempted touch even at some potential danger to themselves. See, *e.g.*, Waltz, *Death Walk Chaplain* (describing how chaplain in 1990 execution "put his hand on the back of [the prisoner's] head" and held his hand while speaking to him, but pulled back immediately before electricity was applied).

This tradition shows that while the methods of execution have evolved over time, the clergy's role has remained constant—they seek to perform a faith's traditional acts of spiritual practice as close in time to the moment of death as the method of execution will allow. Such practices "comport[] with [the] tradition" of prior executions, *Town of Greece*, 572 U.S. at 591-592, and are likewise granted protection by the Free Exercise Clause.

Indeed, this Court has frequently extended Bill of Rights protections to account for "advancing technology." *Kyllo* v. *United States*, 533 U.S. 27, 35 (2001) (new thermal imaging technology constituted search under the Fourth Amendment); *Caetano* v. *Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) ("the Second Amendment extends to arms that were not in existence at the time of the founding") (cleaned up). Here, the adoption of lethal injection as a new execution method has allowed clergy touch even at the moment of death. Permitting clergy touch is thus a logical extension of historical practices and understandings that date to the Founding and before.

2. This conclusion is reinforced by the fact that government procedures since the advent of lethal injection evince a consistent practice of accommodating clergy touch.

18

First and foremost, clergy touch was common in Texas until recently. Prior to removing spiritual advisors in 2019 and then adopting a new policy in 2021, "[t]he Texas execution-day chaplain's routine" involved the chaplain in the chamber "plac[ing] his hand on the inmate until he or she is dead." Walter C. Long, *The Constitutionality and Ethics of Execution-Day Prison Chaplaincy*, 21 Tex. J. C.L. & C.R. 1, 11-12 (2015); see also Pamela Colloff, *The Witness*, Texas Monthly (Sept. 2014), https://perma.cc/4FZS-PLBX (recounting typical experience of Texas "prison chaplain" keeping "one hand resting on the condemned's leg" at death); 6/24/19 Moss Tr. at 19:3-10, *Murphy* v. *Collier*, (No. 19-1106), ECF 38-8 (chaplains "would always ask [the prisoners] if they wanted us to" "put our hand" on them as they died).[5]

Alabama's longstanding chaplaincy practice made similar accommodations. *Ray* v. *Commissioner*, 915 F.3d 689, 696-697 (11th Cir.) ("Chaplain may pray with and touch the inmate's hand as a lethal cocktail of drugs is administered"), *stay vacated on other grounds*, 139 S.Ct. 661, 661 (2019); Associated Press, *Man executed in Alabama* ("A prison chaplain held Brooks' hand and appeared to pray with him as the

---

[5] TDCJ's practices regarding clergy touch are particularly relevant not just because it is the Respondent, but also because over the last decade TDCJ has accounted for anywhere from 29% to 46% of all state executions carried out each year. *Executions by State and Year*, Death Penalty Information Center, https://perma.cc/C2ZA-PLFN. Only eleven states have carried out any execution in the last five years, and one of those (Virginia) subsequently abolished the penalty. *Ibid.* How TDCJ specifically carries out executions is thus of great importance.

19

first drug, a sedative, began flowing."); Johnson, *Inmate in 2005 killing* ("Once the injection was begun, Holman chaplain Chris Summers walked to Lackey's side and held his hand."). In the wake of *Ray* and *Murphy*, Alabama attempted to bar all chaplain access. But after *Dunn* v. *Smith* was decided, Alabama agreed to allow audible prayer, handholding, and anointing with oil by an outside spiritual adviser in the upcoming execution of Willie Smith, the respondent in *Dunn* v. *Smith*. See Kim Chandler, *Alabama: Pastor can hold inmate's hand during execution*, Associated Press (Sept. 9, 2021), https://bit.ly/3uhJ8IN.

Similarly, other states permit touch as part of religious ministry in the chamber. See Dennis Shere, *Warden saw only one answer for troubled La. Prison: Christ*, Baptist Press (Jan. 3, 2008), https://perma.cc/PRA5-5YTL (Angola Warden Burl Cain "held [prisoner's] hand and told him to get ready to see Jesus' face" "as he lay strapped down on the execution gurney"). South Carolina has permitted touch even where the attending visitor was not fulfilling a religious role. John Blume, *Killing the Willing: "Volunteers," Suicide and Competency*, 103 Mich. L. Rev. 939, 939 (2005) (Robert South's lawyer "held his hand while the state took his life by means of lethal injection").

Given the historical record, clergy touch during an execution is both a logical extension of historical practices and understandings of ministry to the condemned, and a consistent practice in its own right. Clergy touch therefore comes within the protection of the Free Exercise Clause.

20

### C. TDCJ's prohibition of historical religious practices triggers strict scrutiny under the Free Exercise Clause.

TDCJ's prohibitions on audible clergy prayer and clergy touch are prohibitions on long-accepted and long-protected historical religious practices and thus must be subjected to strict scrutiny under the Free Exercise Clause.

This Court has long recognized "the utility of historical practice in interpreting constitutional provisions." *Financial Oversight & Mgmt. Bd. for P.R.* v. *Aurelius Inv., LLC*, 140 S.Ct. 1649, 1659 (2020) (citing *M'Culloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819)). And in the last few decades, this Court has repeatedly invoked "historical practices" and "historical understandings" as guideposts for deciding what modern-day practices are protected by the Constitution.[6]

---

[6] See, *e.g.*, *District of Columbia* v. *Heller*, 554 U.S. 570, 625 (2008) (interpretation "accords with the historical understanding of the scope of the [Second Amendment] right"); *Oregon* v. *Ice*, 555 U.S. 160, 164 (2009) (interpreting Sixth Amendment jury-trial right in light of "historical practice"); *Alleyne* v. *United States*, 570 U.S. 99, 112 (2013) (using "historical practice" to determine scope of Sixth Amendment's Confrontation Clause); *Kerry* v. *Din*, 576 U.S. 86, 92 (2015) (Due Process Clause of the Fifth Amendment analyzed in accordance with "historical understanding"); *Betterman* v. *Montana*, 136 S.Ct. 1609, 1614 (2016) ("Our reading [of the Sixth Amendment speedy trial right] comports with the historical understanding."); *Carpenter* v. *United States*, 138 S.Ct. 2206, 2214 (2018) (Fourth Amendment "analysis is informed by historical

21

With respect to the Religion Clauses, the Court has declared that the Establishment Clause "*must* be interpreted by reference to historical practices and understandings." *Town of Greece*, 572 U.S. at 576 (cleaned up; emphasis added).

The same is true of the Free Exercise Clause. The Court has frequently used historical practices to determine the scope of Free Exercise Clause protections. In *Hosanna-Tabor*, the Court looked first to the historical background against which "the First Amendment was adopted," focusing on the particular issue in that case—preventing government from "filling ecclesiastical offices." *Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC*, 565 U.S. 171, 182-184 (2012). It then examined the understanding of early presidential administrations that the First Amendment forbade "rendering an opinion on the 'selection of ecclesiastical individuals.'" *Id.* at 184-185 (discussing Jefferson and Madison administrations). Against that historical backdrop, the Court interpreted the scope of *both* the Free Exercise Clause and the Establishment Clause, concluding that "[t]he church must be free to choose those who will guide it on its way," free from state interference. *Id.* at 196.

Similarly, in *Our Lady*, the Court examined the historical practices surrounding religious education in

understandings"); *Bucklew* v. *Precythe*, 139 S.Ct. 1112, 1122 (2019) ("examin[ing] the original and historical understanding of the Eighth Amendment"); *Kahler* v. *Kansas*, 140 S.Ct. 1021, 1027 (2020) ("Our primary guide in applying [the Due Process Clause of the Fourteenth Amendment] standard is 'historical practice.'").

22

deciding whether the Free Exercise Clause (and the Establishment Clause) prevented interference with religious schools' employment decisions regarding teachers who taught religion. See *Our Lady of Guadalupe Sch.* v. *Morrissey-Berru*, 140 S.Ct. 2049, 2061-2062 (2020).

This Court has therefore already interpreted the protections of the Free Exercise Clause, like the protections of the Establishment Clause, by using historical practices and understandings to determine what modern-day practices are protected. That reflects the simple reality that "[t]he free exercise clause cannot be understood or appreciated without knowing what happened before." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1421 (1990).

Here, TDCJ has imposed a flat ban on historical religious practices known to the Founders and practiced in one form or another ever since. And just as restrictions on the ability to engage in religious rituals, to direct the religious upbringing of one's children, or to gather for communal worship must undergo strict scrutiny, so too must a restriction on a free exercise protection honored by the Founders themselves. See *Church of the Lukumi Babalu Aye* v. *City of Hialeah*, 508 U.S. 520 (1993); *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972); *Agudath Israel of Am.* v. *Cuomo*, 141 S.Ct. 889 (2020); *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 141 S.Ct. 63 (2020); *Tandon* v. *Newsom*, 141 S.Ct. 1294 (2021).

This outcome does not disturb cases like *Turner* v. *Safley*, 482 U.S. 78 (1987) (inmate marriages and inmate-to-inmate correspondence) or *O'Lone* v. *Estate*

23

*of Shabazz*, 482 U.S. 342 (1987) (return from offsite work location at midday for communal inmate worship). As in *Town of Greece*, "[a]ny test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 572 U.S. at 577. And to the extent that "formal doctrine seems to have strayed from the fundamental values of the constitutional provision" "[h]istory plays an especially important role in constitutional interpretation[.]" Michael W. McConnell, *Reflections on* Hosanna-Tabor, 35 Harv. J.L. & Pub. Pol'y 821, 827 (2012). Thus, if a particular test suggests that ancient practices well-known to the Framers—such as audible clergy prayer and clergy touch—would be unprotected, "it is time to look back and seek guidance from history." *Id.* at 827-828.

*Employment Division* v. *Smith*, 494 U.S. 872 (1990) is also not at issue. The rule of *Smith* does not apply to restrictions that "target[] religious conduct for distinctive treatment." *Lukumi*, 508 U.S. at 534, 546. Here, TDCJ's bans on audible clergy prayer and clergy touch at the time of execution are directed solely at religious practices, and thus by definition do not come within the rule of *Smith*.

## II. Denying audible clergy prayer and clergy touch also triggers strict scrutiny under RLUIPA.

There is an independent reason that TDCJ must allow both audible clergy prayer and clergy touch: RLUIPA. RLUIPA "provide[s] very broad protection for religious liberty." *Holt*, 574 U.S. at 356 (quoting *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). It safeguards "any exercise of religion,

24

whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. 2000cc-5(7)(A). To that end, RLUIPA requires strict scrutiny here. See 42 U.S.C. 2000cc-1(a).

Indeed, this Court's past emergency-docket cases on death-chamber clergy access have *already* considered this question under RLUIPA. See *Dunn*, 141 S.Ct. 725; *Gutierrez* v. *Saenz*, 141 S.Ct. 1260 (2021); *Murphy*, 139 S.Ct. at 1475. In each of those cases, the Court ruled for the prisoner. It should be no different here.

Here there can be little question that TDCJ's policy substantially burdens Ramirez's religious exercise of preparing to meet his Maker by receiving audible clergy prayer and clergy touch. Ramirez requests Pastor Moore to be present at his execution "to pray with him and provide spiritual comfort and guidance in [his] final moments." 2d Am. Compl., ECF 12 ¶ 22 (Aug. 22, 2021). Consistent with Christian tradition, Ramirez believes that the presence of his pastor in those moments "will help him" prepare for life after death. *Murphy*, 139 S.Ct. at 1484 (Alito, J., dissenting). The district court acknowledged that "Ramirez's pleadings do not give any reason to doubt his sincerely held religious beliefs." Pet.App.23. So flatly prohibiting Ramirez from these forms of access to his pastor in the execution chamber is, by definition, a substantial burden under RLUIPA. See *Yellowbear* v. *Lampert*, 741 F.3d 48, 56 (10th Cir. 2014) (Gorsuch, J.) (noting that "flatly prohibiting Mr. Yellowbear from participating in an activity motivated by a sincerely held religious belief" imposes substantial burden).

Strict scrutiny is therefore triggered under RLUIPA as well.

25

### III. TDCJ cannot make out a successful strict scrutiny affirmative defense under either the Free Exercise Clause or RLUIPA.

Because Ramirez has made out his case with respect to both the Free Exercise Clause and RLUIPA, the burden of proof shifts to TDCJ to prove, as an affirmative defense, that its bans on audible clergy prayer and clergy touch withstand strict scrutiny.

1. TDCJ cannot satisfy that "exceptionally demanding" standard here. *Holt*, 574 U.S. at 364. Where strict scrutiny applies, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton* v. *City of Philadelphia*, 141 S.Ct. 1868, 1881 (2021). And that burden is measured with reference to the plaintiff alone; rather than rely on "broadly formulated interests," courts must "'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Ibid.* (quoting *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). And where other "well-run institutions" are achieving the relevant interest while burdening religion to a lesser degree, TDCJ must "at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 574 U.S. at 368-369; see also *Dunn*, 141 S.Ct. at 725 (Kagan, J., concurring) ("past practice, in Alabama and elsewhere," demonstrated that religious practice could be accommodated safely).

As a result, this Court has explained, "if a less restrictive means is available for the Government to achieve its goals, the Government must use it," or otherwise "prove that it could not adopt the less restrictive alternative." *Holt*, 574 U.S. at 365 (cleaned

26

up). And in making that showing, "[i]t is the government's burden to show [other jurisdictions'] alternative[s] won't work." *Mast* v. *Fillmore County*, 141 S.Ct. 2430, 2433 (2021) (Gorsuch, J., concurring) ("lower courts failed to give sufficient weight to rules in other jurisdictions"). In other contexts, the Court has observed that a failure to address other jurisdictions' tailored practices fails even intermediate scrutiny, see *McCullen* v. *Coakley*, 573 U.S. 464, 490 (2014), let alone strict scrutiny. Indeed, an indication that "many" accommodations have been safely granted by other jurisdictions "suggests that [a prison system] could satisfy its security concerns through a means less restrictive than denying petitioner the exemption he seeks." *Holt*, 574 U.S. at 368-369. The government defendant must, "at a minimum, offer persuasive reasons why it believes that it must take a different course" from other "well-run institutions." *Id.* at 369.

By the same logic, TDCJ must offer persuasive reasons why it must differ from a practice with a long historical foundation. When a practice has a well-established history of workability, the onus is on the state to demonstrate that circumstances have changed and that there is a meaningful difference between the religious accommodation sought today and similar historical accommodations.

2. Here, TDCJ swims against an overwhelming tide: it must affirmatively distinguish other jurisdictions' past and present practices, which have safely allowed audible prayer and clergy touch as part of spiritual guidance in the execution chamber. This it cannot do. Indeed, Alabama—the other State that recently sought to ban clergy from the death chamber—has now agreed to allow audible clergy

27

prayer, clergy touch, and even anointing with oil in the death chamber. If the Alabama Department of Corrections can do it, then TDCJ must explain why it can't. See *Holt,* 574 U.S. at 364.

Moreover, under *Holt*, TDCJ must also affirmatively distinguish its *own* pre-*Murphy* policies and practices, which for decades allowed audible prayer and physical touch by in-chamber clergy— including at times "outsiders"—without incident. See Reavis, *Charlie Brooks' Last Words*. And courts applying RLUIPA have found that prisons lack a compelling interest in banning practices they previously permitted. See, *e.g., Spratt* v. *Rhode Island Dep't of Corr.*, 482 F.3d 33, 39 (1st Cir. 2007) (prison lacked compelling interest in banning preaching that it previously allowed).

If anything, changes in circumstances from historical practices make accommodation *easier*, not harder. Lethal injection in the tightly-controlled Huntsville death chamber is far less likely to be disrupted than were, say, hangings at the Tyburn Gallows by those who "crowd[ed] in thousands to the legal massacre." Samuel Johnson, *The necessity of proportioning punishments to crimes*, The Rambler, No. 114, April 20, 1751, reprinted in 4 *Boswell's Life of Johnson* 188 n.3 (George Birkbeck Hill & L. F. Powell eds., Oxford 1934). Yet clergy had full access across a wide variety of historic scenarios that were far less secure than Huntsville.

3. TDCJ says Pastor Moore, a Southern Baptist minister, "poses a greater risk" than other prison staff because he "is an outside spiritual advisor." TDCJ C.A. Br. 26. This argument is wrong on both the law and the facts. With respect to the law, TDCJ made the

28

same argument in *Murphy*, but the Court nevertheless ordered that TDCJ provide access to what TDCJ would call an "outside" Buddhist spiritual advisor. 139 S.Ct. at 1475. The argument also proves too much: because the number of religions represented by TDCJ-employed chaplains is necessarily limited, excluding "outside" clergy would discriminate against prisoners of minority religions. The answer therefore is not to "level down" by excluding all clergy, but to "level up" by including properly-vetted spiritual advisors, even if they are from the "outside."

The "outsider" argument also has a faulty factual premise. Pastor Moore has visited Ramirez since 2016 to provide counseling and spiritual advice. TDCJ has thus known and interacted with Pastor Moore for over five years. Yet TDCJ has not explained why a Southern Baptist pastor, who has served inmates within TDCJ facilities for half a decade, poses a risk and undermines its goal to ensure "that the execution occurs without any complications, distractions, or disruptions." *Murphy,* 139 S.Ct. at 1475-1476. TDCJ's late-breaking concern that Pastor Moore is from the "outside" "does not justify [TDCJ's] categorical bar. [TDCJ] can take any number of measures to ensure that a clergy member will act responsibly during an execution. * * * What [TDCJ] cannot do, consistent with strict scrutiny, is simply presume that every clergy member will be untrustworthy—or otherwise said, that only the harshest restriction can work." *Dunn*, 141 S.Ct. at 726 (Kagan, J., concurring) (citing

29

*Holt*, 574 U.S. at 369).[7]

Moreover, other jurisdictions under the same constraints allow "outside" ministers. Alabama is allowing Willie Smith's minister to be with him for the execution, and the Bureau of Prisons has done the same. See *Smith* v. *Commissioner*, 844 F.App'x 286, 292 (11th Cir. 2021) (noting BOP "has allowed the spiritual advisor of the prisoner's choice to be present in the execution chamber" without "disruption or disturbance" following a "background check"), motion to vacate denied, *Dunn*, 141 S.Ct. 725. Allowing "outside" clergy is therefore feasible.

On the long view, Ramirez is not requesting anything unusual. Prior to 2019, TDCJ would normally have provided audible clergy prayer and clergy touch from a Christian pastor, or from a Muslim chaplain. But now that TDCJ—beginning with Murphy's request for Buddhist prayer—has ventured down the path of trying to restrict these ancient religious practices, the First Amendment and RLUIPA come to bear. And it could not be clearer from a historical point of view that the Free Exercise Clause protects those religious exercises—even, and in fact especially, for the condemned.

---

[7] TDCJ never explains why someone on TDCJ's payroll—as opposed to a contract chaplain or a volunteer spiritual advisor—would be more concerned about the penalties for disruption. Surely the paycheck cannot be the difference, especially where interference would be a crime. See Tex. Penal Code § 38.15 (crime to "interrupt[], disrupt[], impede[], or otherwise interfere[] with" peace officer carrying out duties).

## IV. The Court can and should grant conditional relief to Ramirez.

The Court has asked the parties to address "the type of equitable relief petitioner is seeking, the appropriate standard for this relief, and whether that standard has been met here." Order, No. 21-5592 (Sept. 10, 2021). *Amicus* suggests that the Court consider these questions in light of the historical bounds of equitable relief, and specifically the ancient equitable remedy of conditional injunctive relief. In particular, historical understandings of equity indicate that this Court—and the lower courts—have the power to grant conditional relief to Ramirez. That history demonstrates that the Court can prohibit TDCJ from conducting the execution unless it affords Ramirez audible clergy prayer and clergy touch at the time of execution.

"The Judiciary Act of 1789 conferred on the federal courts jurisdiction over all suits in equity." *Grupo Mexicano de Desarrollo, S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (cleaned up). Although "equity is flexible," "that flexibility is confined within the broad boundaries of traditional equitable relief." *Id.* at 322. Accordingly, across many domains this Court routinely looks to "traditional principles of equity practice" to determine the scope of its equitable powers. *Taggart* v. *Lorenzen*, 139 S.Ct. 1795, 1801 (2019) (contempt); see also, *e.g.*, *Liu* v. *SEC*, 140 S.Ct. 1936, 1942 (2020) (traditional equity determines scope of equitable remedy); *Petrella* v. *Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014) (traditional equity determines scope of equitable defense).

Conditional decrees fall squarely within the federal courts' jurisdiction. They are a centuries-old feature of

31

equity and provide a useful way for the courts to fashion relief that balances competing equities. See John Norton Pomeroy, 1 *Pomeroy's Equity Jurisprudence* § 385 at 636-638 (3d ed. 1905); Samuel L. Bray, *Remedies, Meet Economics; Economics, Meet Remedies*, 38 Oxford J. of Legal Studies 71, 77-78 & nn.47-49 (2018).

Conditional relief is rooted in the maxim of equity that "[t]hose who seek equity must do equity." John D. Heydon, Mark J. Leeming & P.G. Turner, *Meagher, Gummow & Lehane's Equity: Doctrines & Remedies* § 3-050, at 74 (5th ed. 2015). It is a commonplace of equity that conditions may be imposed upon a plaintiff in equity: "The general principle is stated this way by the leading equity treatise: 'If the decree is to be final, equity may impose any condition on the plaintiff that will protect the legal or equitable rights of the defendant as the price of granting relief.'" Bray, 38 Oxford J. of Legal Studies at 77-78 (quoting Heydon et al., § 3-050–§ 3-070 at 74-77). Importantly, however, courts of equity may also impose conditions on defendants in equity who seek to defeat an equitable claim. See, *e.g.*, *Lindsey* v. *Clark*, 69 S.E.2d 342, 345 (Va. 1952), discussed in *Ames, Chafee & Re on Remedies: Cases and Materials* 609-611 (Emily Sherwin & Samuel L. Bray, eds., 3d ed. 2019) (upholding decree imposing conditions on both plaintiff and defendant).

The Court has already issued such an order in a prior prisoner clergy access case involving TDCJ, ruling that "The State may not carry out Murphy's execution pending the timely filing and disposition of a petition for a writ of certiorari *unless* the State permits Murphy's Buddhist spiritual advisor or

32

another Buddhist reverend of the State's choosing to accompany Murphy in the execution chamber during the execution." *Murphy*, 139 S.Ct. at 1475 (emphasis added). It is thus entirely appropriate for the Court (or a lower court) to issue a similar order in this case.

That said, it is worth reemphasizing that the principle of "do[ing] equity" operates on both plaintiffs and defendants. That means that plaintiffs under a sentence of death who seek equitable relief with respect to clergy access must do so with clean hands, and not for the purpose of delay or manipulation. See *Hill* v. *McDonough*, 547 U.S. 573, 584-585 (2006). A court can therefore deny conditional relief with respect to clergy access if it finds that the timing of the motion seeking relief was designed to delay or manipulate. *Id.* at 584.

Here, however, it is TDCJ that is unable to say that it has done equity. In particular, the August 19 letter announcing the no-audible-prayer rule just 19 days before the scheduled execution date is itself a form of manipulation that constitutes unclean hands. TDCJ's equitable defenses should be rejected on that ground alone. For his part, Ramirez has sought relief with respect to both audible clergy prayer and clergy touch in a timely fashion, particularly given TDCJ's actions. Having done equity to seek equity, he should be granted conditional relief.

## CONCLUSION

The decision below should be reversed.

33

Respectfully submitted.

ERIC C. RASSBACH
  *Counsel of Record*
LORI H. WINDHAM
CHRIS PAGLIARELLA
DANIEL L. CHEN
JAMES J. KIM
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Penn. Ave., NW
Suite 400
Washington, DC 20006
(202) 955-0095
erassbach@becketlaw.org

MICHAEL W. MCCONNELL
559 Nathan Abbott Way
Stanford, CA 94305

JOSHUA C. MCDANIEL
JAMES A. SONNE
HARVARD LAW SCHOOL
  RELIGIOUS FREEDOM CLINIC
1585 Massachusetts Ave.
Cambridge, MA 02138