# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURTFOR THE SOUTHERN DISTRICT OF TEXASHOUSTON DIVISION**

| | | |
|---|---|---|
| RAMIRO FELIX GONZALES, *Plaintiff*, | § § § | |
| v. | § § | Civil Case No. 4:21-cv-00828 |
| BRYAN COLLIER, Executive Director,Texas Department of Criminal Justice, Huntsville, Texas; | § § § § § | |
| BOBBY LUMPKIN, Director, TexasDepartment of Criminal Justice, Correctional Institutions Division, Huntsville, Texas; | § § § § § | ***EXECUTION SCHEDULEDFOR JULY 13, 2022*** |
| *and* | § § | |
| DENNIS CROWLEY, Warden, Texas Department of Criminal Justice, HuntsvilleUnit, Huntsville, Texas, *Defendants*. | § § § § § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION**

TO:    Plaintiff Ramiro Felix Gonzales, by and through his attorneys of record Jeremy Schepers 525 S. Griffin St., Ste. 629 Dallas, Tx 75202 and Steven T. Collis 727 E. Dean Keaton St. Austin, Tx 78705

COME NOW, Defendants in the above referenced civil action, and give their responses to

Plaintiff Gonzales' Request for Admissions.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General


**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

**SHANNA MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense Division


*/s/ Leah O'Leary*
**LEAH O'LEARY**
Assistant Attorney General
Attorney-in-Charge
State Bar No. 24079074
Southern District No. 1563191
Leah.Oleary@oag.texas.gov

Law Enforcement Defense Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080 / Fax (512) 370-9918

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I, **LEAH O'LEARY**, Assistant Attorney General of Texas, certify that I have served Plaintiff with a true and correct copy of the above and foregoing **Defendants Response to Plaintiff's Request for Admissions** on this _____ April 2022, as follows:

> Jeremy Schepers
> Supervisor, Capital Habeas Unit
> Office of the Federal Public Defender
> Northern District of Texas
> 525 S. Griffin St. Ste. 629
> Dallas, Tx 75202
> 214-767-2746
> Jeremy_schepers@fd.org
>
> Steven T. Collis
> Director, Law & Religion Clinic
> University of Texas School of Law
> 727 E. Dean Keaton St.
> Austin, Tx 78705
> 512-475-9090
> Steven.collis@law.utexas.edu

*/s/ Leah O'Leary*
Leah O'Leary
Assistant Attorney General

# DEFENDANTS' RESPONSES
## TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

Plaintiff's Request for Admissions was served on Defendants Collier, Lumpkin, and Crowley collectively. They are sued only in their official capacities. Accordingly, they answer these requests collectively.

## REQUEST FOR ADMISSION NO. 1:

Admit that there has never been a security incident during an inmate's last communion in Texas, if provided, when performed at Polunsky Unit in the 24 hours preceding the execution.

**Response:** Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "security incident" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request, and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants further object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information personally known to the named Defendants or available in TDCJ records, which would be limited by applicable retention policies.

Defendants admit that they are not aware of a disruption that has occurred when an inmate has received last communion at the Polunsky Unit in the 24 hours preceding the inmate's execution, and Defendants have found no records of such disruption.

## REQUEST FOR ADMISSION NO. 2:

Admit there has never been a security incident caused by a TDCJ-employed chaplain in the deathhouse prior to an execution in Texas.

**Response:** Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the terms "death house" and "security incident" are vague and undefined. Because Plaintiff failed to define these terms, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants further object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information personally known to the named Defendants or available in TDCJ records, which would be limited by applicable retention policies.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants admit they are unaware of a disruption caused by a TDCJ-employed chaplain in the death house prior to an execution in Texas and have found no records of such disruption.

## REQUEST FOR ADMISSION NO. 3:

Admit there has never been a security incident caused by a non-employee spiritual advisor in the death house prior to an execution in Texas.

**Response:** Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "death house" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants further object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information personally known to the named Defendants or available in TDCJ records, which would be limited by applicable retention policies.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants admit they are unaware of a disruption caused by a non-employee spiritual advisor in the death house prior to an execution in Texas and have found no records of such disruption.

## REQUEST FOR ADMISSION NO. 4:

Admit there has never been a security incident caused by any non-employee in the death house prior to an execution in Texas.

**Response:** Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the terms "death house" and "security incident" are vague and undefined. Because Plaintiff failed to define these terms, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants further object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information personally known to the named Defendants or available in TDCJ records, which

would be limited by applicable retention policies.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants deny this request because they are aware of one or more disruptions caused by a non-employee in the death houseprior to an execution in Texas.

## **REQUEST FOR ADMISSION NO. 5:**

Admit there has never been a security incident caused by a TDCJ-employed chaplain in theexecution chamber in Texas.

**Response:** Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "security incident" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants further object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information personally known to the named Defendants or available in TDCJ records, which would be limited by applicable retention policies.

Subject to these objections and qualifications, Defendants admit they are unaware of a disruption caused by a TDCJ-employed chaplain in theexecution chamber and have found no records of such disruption.

## **REQUEST FOR ADMISSION NO. 6:**

Admit there has never been a security incident caused by a non-employee spiritual advisor in theexecution chamber in Texas.

**Response:** Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "security incident" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants further object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information personally known to the named Defendants or available in TDCJ records, which

would be limited by applicable retention policies.

Subject to these objections and qualifications, Defendants admit that, under the current security measures in place that allow a spiritual advisor to be present in the execution chamber, no non-employee spiritual advisor has caused a disruption during a scheduled execution.

**REQUEST FOR ADMISSION NO. 7:**

Admit that restraints on the execution gurney in Texas are made of leather straps with a steelbuckle.

**Response:** Defendants admit that restraints on the execution gurney in Texas are made of leather straps with a metal buckle. Defendants can neither admit nor deny whether the metal buckle is steel.

**REQUEST FOR ADMISSION NO. 8:**

Admit that no inmate in the execution chamber has ever broken free of the gurney restraints since1982 in Texas, when lethal injection was first deployed as Texas's method of execution.

**Response:** Defendants admit that they are unaware of an incident in which an inmate in the execution chamber has broken free of the gurney restraints, and Defendants have found no records of such incident.

**REQUEST FOR ADMISSION NO. 9:**

Admit that no TDCJ-employed chaplain has attempted to release the inmate from his or herrestraints in the execution chamber in Texas.

**Response:** Defendants admit that they are unaware of an incident where a TDCJ-employed chaplain has attempted to release an inmate from his or her restraints in the execution chamber during an execution and have found no records of such an incident.

**REQUEST FOR ADMISSION NO. 10:**

Admit that no non-employee spiritual advisor has attempted to release the inmate from his or herrestraints in the execution chamber in Texas.

**Response:** Defendants admit that under the current security measures in place that allow a non-employee spiritual advisor to be present in the execution chamber, no non-employee spiritual advisor has attempted to release the inmate from his or herrestraints in the execution chamber.

**REQUEST FOR ADMISSION NO. 11:**

Admit that the dimensions of the execution chamber in Texas are approximately nine feet by twelve feet.

**Response:**     Defendants admit.

**REQUEST FOR ADMISSION NO. 12:**

Admit that a non-employee spiritual advisor approved to be in the execution chamber would stand about three feet from the inmate under current TDCJ policy.

**Response:**     Defendants object to this request as vague. Subject to this objection, Defendants can neither admit nor deny this request because the answer would depend on the religious accommodation requested by the inmate who is being executed and whether TDCJ grants the request for accommodation.

**REQUEST FOR ADMISSION NO. 13:**

Admit that two TDCJ staff members are inside the execution chamber during the execution process.

**Response:**     Defendants admit that there are two TDCJ employees inside the execution chamber during a scheduled execution. If a spiritual advisor is present inside the execution chamber, there is also a security escort inside the execution chamber, who is an employee of the Texas Board of Criminal Justice Office of the Inspector General.

**REQUEST FOR ADMISSION NO. 14:**

Upon admission to No. 13 above, admit that the number of security guards in the execution chamber during the execution process remains the same across executions in Texas.

**Response:**     Defendants object to this request on the grounds that the term "security guards" is vague and is not a term utilized in TDCJ policies or practice. TDCJ does not refer to staff as "security guards." The Warden, for example, who is one of the TDCJ employees always present in the execution chamber during an execution, is not a "security guard."

Subject to this objection and qualification, Defendants admit that the number of TDCJ employees in the execution chamber during a scheduled execution is the same for all executions in Texas.

**REQUEST FOR ADMISSION NO. 15:**

Upon admission to No. 13 above, admit that the quantity of security guards in the execution chamber during the execution process constitutes the minimum number required to ensure a secure, smooth, and humane execution in Texas.

**Response:** Defendants object to this request on the grounds that the term "security guards" is vague and is not a term utilized in TDCJ policies or practice. TDCJ does not refer to staff as "security guards." The Warden, for example, who is one of the TDCJ employees always present in the execution chamber during an execution, is not a "security guard."

Subjection to this objection, Defendants deny. There is no minimum number of TDCJ employees who could ensure a secure, smooth, and humane execution because the number of employees is not the singular factor that mitigates risk. Rather, the number of TDCJ employees, their qualifications, experience and training, and many other security protocols all contribute to mitigate the risk of disruptions, security breaches, and risks to the dignity of the process for the inmate and the inmate's and victim's families, and other compelling penological interests.

**REQUEST FOR ADMISSION NO. 16:**

Admit that additional TDCJ staff members are standing outside the door of the execution chamberduring the execution process.

**Response:**    There are two doors to the execution chamber: one door separates the execution chamber and the drug room, and the other door separates the execution chamber and the pre-execution holding area. The identities of the persons standing in the drug room during an execution or how many there may be is confidential by law and not subject to disclosure. Defendants admit there are additional TDCJ employees who are standing outside the door that separates the execution chamber and the pre-execution holding area during an execution.

**REQUEST FOR ADMISSION NO. 17:**

Admit that no TDCJ-employed chaplain has attempted to interfere with the administration of drugsduring the execution process in Texas, including attempting to remove IV lines.

**Response:**    Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information personally known to the named Defendants or available in TDCJ records, which would be limited by applicable retention policies.

Defendants admit that they are not aware of an incident where a TDCJ-employed chaplain has attempted to interfere with the administration of drugsduring an execution, including attempting to remove IV lines, and have found no records of such an incident.

**REQUEST FOR ADMISSION NO. 18:**

Admit that no non-employee spiritual advisor has attempted to interfere with the administration of drugs during the execution process in Texas, including attempting to remove IV lines.

**Response:**    Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information since April 21, 2021, when TDCJ amended the execution protocol to allow non-TDCJ employee spiritual advisors inside the execution chamber, and information before April 21, 2021, is being withheld based on this objection.

Subject to this objection, Defendants admit that under the current security measures in place that allow a spiritual advisor to be present in the execution chamber with certain restrictions, there has not been such an incident.

**REQUEST FOR ADMISSION NO. 19:**

Admit that TDCJ policy will not allow a non-employee spiritual advisor to audibly pray in the execution chamber during the execution process.

**Response:**    Defendants deny. The TDCJ execution policy is silent on whether a non-employee spiritual advisor or TDCJ-employee chaplain may audibly pray in the execution chamber during an execution. Moreover, TDCJ has allowed a non-employee spiritual advisor to pray audibly in the execution chamber during an execution.

**REQUEST FOR ADMISSION NO. 20:**

Admit that TDCJ policy will not allow a non-employee spiritual advisor to physically touch the condemned in the execution chamber during the execution process.

**Response:**    Defendants deny. The TDCJ execution policy is silent on whether a non-employee spiritual advisor or TDCJ-employee chaplain may physically touch the condemned in the execution chamber during an execution. Moreover, TDCJ has allowed a non-employee spiritual advisor to physically touch the condemned inmate in the execution chamber during an execution.

**REQUEST FOR ADMISSION NO. 21:**

Admit that TDCJ's execution team typically rehearses the execution process at least once before each execution date.

**Response:**    Defendants admit.

**REQUEST FOR ADMISSION NO. 22:**

If yes to No. 21 above, admit that non-employee spiritual advisors are not invited to observe orparticipate in TDCJ's execution rehearsal in advance of the inmate's scheduled execution.

**Response:**    Defendants admit.

**REQUEST FOR ADMISSION NO. 23:**

Admit that the six-week new-hire trainings that TDCJ-employed chaplains receive do not containany instruction or guidance on execution protocols.

**Response:**    Defendants admit that instruction and guidance on execution protocols is not included in the new-hire training for TDCJ-employed chaplains.

**REQUEST FOR ADMISSION NO. 24:**

Admit that the day-to-day trainings that TDCJ-employed chaplains receive do not contain any instruction or guidance on execution protocols.

**Response:** Defendants object to this request on the grounds that the term "day-to-day training" is vague and undefined, and it is unclear what is being requested. For the 3-4 TDCJ-employed chaplains who typically serve a role in the execution process, their daily responsibilities may include training or discussing execution protocols or plans for an upcoming execution. But that will not be the case for the remaining TDCJ-employed chaplains. Accordingly, Defendants can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 25:**

Admit that, even when it is possible, non-employee spiritual advisors are not offered the training opportunity to observe executions in the witness viewing room and death house prior to ministering to an inmate in the execution chamber in Texas.

**Response:**    Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the terms "death house" and "ministering" are vague and undefined. Defendants further object to this request in that it requires the Defendants to assume contested facts not in evidence; namely, that spiritual advisors "minister" to an inmate while inside the execution chamber.

Adopting their own interpretation of the vague and undefined terms, Defendants deny. A non-employee spiritual advisor may have had an opportunity to observe an execution from a witness viewing room if the condemned inmate listed the non-employee spiritual advisor as a witness.

**REQUEST FOR ADMISSION NO. 26:**

Admit that there is no TDCJ policy offering non-employee spiritual advisors the opportunity to receive guidance or mentorship from TDCJ-employed chaplains with experience ministering to an inmate in the execution chamber.

**Response:** Defendants object to this request on the grounds that the term "ministering" is vague and undefined and is not a term that is universally understood. Defendants further object to this request in that it requires the Defendants to assume contested facts not in evidence; namely, that spiritual advisors "minister" to an inmate while inside the execution chamber.

Adopting their own interpretation of the vague and undefined terms, Defendants deny. To be approved to be present in the execution chamber during an execution, a spiritual advisor must attend a 2-hour, in-person orientation, which includes guidance from a TDCJ-employed chaplain who has experience ministering to an inmate who is scheduled for execution and has been inside the execution chamber during an execution.

**REQUEST FOR ADMISSION NO. 27:**

Admit that TDCJ has no concerns about the sincerity of Mr. Gonzales's religious beliefs.

**Response:**     Defendants deny. See Defendants response to interrogatory number 13.

**REQUEST FOR ADMISSION NO. 28:**

Admit that TDCJ has no concerns about the sincerity of Mr. Gonzales's specific religious request for audible prayer from Bri-Anne Swan during his execution.

**Response:**     Defendants deny. See Defendants response to interrogatory number 13.

**REQUEST FOR ADMISSION NO. 29:**

Admit that TDCJ has no concerns about the sincerity of Mr. Gonzales's specific religious request for physical touch from Bri-Anne Swan during his execution.

**Response:**     Defendants deny. See Defendants response to interrogatory number 13.

**REQUEST FOR ADMISSION NO. 30:**

Admit that TDCJ has a procedure that it consistently follows for determining whether an inmate's requested religious accommodation is sincere.

**Response:**    Defendants deny. The procedure used by TDCJ is based on a review of the circumstances of each inmate's requested religious accommodation(s).

**REQUEST FOR ADMISSION NO. 31:**

Upon admission to No. 30 above, admit that TDCJ has never concluded that a religious accommodation requested by Plaintiff Ramiro Felix Gonzales was not sincere.

**Response:**    Defendants deny.

**REQUEST FOR ADMISSION NO. 32:**

Admit that Plaintiff Ramiro Felix Gonzales's religious orientation statement, prepared specifically for his execution, indicates that he is a Messianic Christian.

**Response:**    Defendants admit.

**REQUEST FOR ADMISSION NO. 33:**

Admit that TDCJ currently has no knowledge of any instance where the safety or security of an execution in Texas has actually been jeopardized by the audible prayer of a spiritual advisor or chaplain during the execution process.

**Response:**    Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information since April 21, 2022, when TDCJ first allowed a non-employee spiritual advisor to pray aloud in the execution chamber during an. Information before April 21, 2022, is being withheld based on this objection.

Subject to this objection and qualification, Defendants admit with regard to audible prayer by a non-employee spiritual advisor.

**REQUEST FOR ADMISSION NO. 34:**

Admit that TDCJ currently has no knowledge of any instance where the safety or security of an execution in Texas has actually been jeopardized by a spiritual advisor physically touching an inmate during the execution process.

**Response:**    Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information since April 21, 2022, when TDCJ first allowed a non-employee spiritual advisor to physically touch an inmate in the execution chamber during an. Information before April 21, 2022, is being withheld based on this objection.

Subject to this objection and qualification, Defendants admit with regard to physical touch by a non-employee spiritual advisor.

**REQUEST FOR ADMISSION NO. 35:**

Admit that TDCJ has no evidence that Bri-Anne Swan, specifically, poses a security threat of interference with Mr. Gonzales's execution.

**Response:**    Defendants admit.

**REQUEST FOR ADMISSION NO. 36:**

Admit that, prior to the April 2, 2019, Execution Procedure policy change, TDCJ allowed employee chaplains in the execution chamber.

**Response:**    Defendants admit, with the qualification that not all TDCJ-employed chaplains were permitted inside the execution chamber. A very select few TDCJ-employed chaplains were chosen to serve a role in the execution process, including being inside the execution chamber.

**REQUEST FOR ADMISSION NO. 37:**

Admit that, prior to the April 2, 2019, Execution Procedure policy change, TDCJ allowed employee chaplains in the execution chamber to audibly pray during the execution process.

**Response:**    Defendants object to this request on the ground that the information requested is not relevant because TDCJ allows physical touch and audible prayer by a spiritual advisor in the execution chamber within the guidelines set forth by the U.S. Supreme Court in *Ramirez v. Collier*.

Subject to this objection, Defendants deny. Not all TDCJ-employed chaplains were permitted inside the execution chamber. A very select few TDCJ-employed chaplains were chosen to serve a role in the execution chamber during an execution. And while in the execution chamber, the TDCJ-employed chaplain's role and responsibilities did not include audible prayer. Defendants are not aware of and have found no records of any instance when a TDCJ-employed chaplain audibly prayed inside the execution chamber during an execution.

**REQUEST FOR ADMISSION NO. 38:**

Admit that, prior to the April 2, 2019, policy change, TDCJ allowed employee chaplains in the execution chamber to physically touch the condemned inmate during the execution process.

**Response:**    Defendants object to this request on the ground that the information requested is not relevant because TDCJ allows physical touch and audible prayer by a spiritual advisor in the execution chamber within the guidelines set forth by the U.S. Supreme Court in *Ramirez v. Collier*.

Defendants deny. Not all TDCJ-employed chaplains were permitted inside the execution chamber. A very select few TDCJ-employed chaplains were selected to serve a role in the execution chamber during an execution. And while in the execution chamber, the TDCJ-

employed chaplain's role and responsibilities did not include physically touching the inmate. Defendants are aware of a few occasions where the TDCJ-employed chaplain momentarily touched or placed a hand on the foot of an inmate who was secured to the gurney in the execution chamber, but physical contact has never been permitted once administration of the lethal drugs is about to begin. Defendants are not aware of and have found no records of any instance where a TDCJ-employed chaplain maintained physical contact of any kind during the administration of the lethal drugs.

## REQUEST FOR ADMISSION NO. 39:

Admit that TDCJ specifically tasked employee chaplains to work in the execution chamber in part to keep the condemned calm.

**Response:** Defendants admit, with the qualification that not all TDCJ-employed chaplains were permitted inside the execution chamber. A very select few TDCJ-employed chaplains were selected to serve a role in the execution process.

## REQUEST FOR ADMISSION NO. 40:

Admit that, in their professional judgment, the condemned is more likely to resist execution or otherwise cause a disruption if TDCJ barred all chaplains and spiritual advisors from both the death house and the execution chamber.

**Response:** Defendants object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "death house" is vague and undefined. Defendants further object to this request in that the request does not indicate who "their" refers to and therefore the request does not state with reasonable specificity what information is being requested. Defendants further object to this request as argumentative and it requires the Defendants to assume facts not in evidence. Based on these defects, Defendants are unable to admit or deny.

## REQUEST FOR ADMISSION NO. 41:

Admit that TDCJ's security policies are the same for all non-employees who enter the death house.

**Response:** Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information relevant to the evening of a scheduled execution and information not applicable to the evening of a scheduled execution is being withheld based on this objection. Defendants further object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the terms "security policies" and "death house" are vague and undefined. Because Plaintiff failed to define these terms, Defendants will adopt their own definitions in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants admit that all non-employees who enter the "death house" are subject to the same security and search requirements.

## REQUEST FOR ADMISSION NO. 42:

Admit that TDCJ's security policies for non-employees who enter the death house are the same as the security policies as those for non-employees entering any other TDCJ maximum-security facility.

**Response:** Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information relevant to the evening of a scheduled execution and information not applicable to the evening of a scheduled execution is being withheld based on this objection. Defendants further object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the terms "security policies" and "death house" are vague and undefined. Because Plaintiff failed to define these terms, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants deny because non-employees who enter the death house may be subject to different security and search procedures than non-employees who enter another TDCJ maximum security facility.

## REQUEST FOR ADMISSION NO. 43:

Admit that TDCJ subjects all non-employees who enter the death house to a search for unauthorized items or contraband.

**Response:** Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information relevant to the evening of a scheduled execution and information not applicable to the evening of a scheduled execution is being withheld based on this objection. Defendants further object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "death house" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants admit.

**REQUEST FOR ADMISSION NO. 44:**

Admit that TDCJ checks each visitor entering the death house against the pre-approved list of all non-employee persons authorized to enter the death house.

**Response:** Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information relevant to the evening of a scheduled execution and information not applicable to the evening of a scheduled execution is being withheld based on this objection. Defendants further object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "death house" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding. Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants admit that TDCJ checks each visitor to the Huntsville Unit on the evening of a scheduled execution against a pre-approved list of persons authorized to witness a scheduled execution.

**REQUEST FOR ADMISSION NO. 45:**

Admit that TDCJ requires all non-employees who enter the death house to walk through a metal detector.

**Response:** Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information relevant to the evening of a scheduled execution and information not applicable to the evening of a scheduled execution is being withheld based on this objection. Defendants further object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "death house" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections and qualifications, Defendants deny that all non-employees who enter the death house on the evening of an execution walk through a metal detector. Defendants admit that all non-employees who enter the death house on the evening of an execution must submit to a pat-down search and a search by handheld metal detector.

**REQUEST FOR ADMISSION NO. 46:**

Admit that TDCJ provides a security escort for all non-employees who enter the death house.

**Response:**    Defendants object to this request on the ground that it fails to specify what time period the information is being requested. Defendants therefore interpret the request to seek only information relevant to the evening of a scheduled execution and information not applicable to the evening of a scheduled execution is being withheld based on this objection. Defendants further object to this request on the grounds that it includes vague and undefined terms that do not have a universally understood meaning. Specifically, the term "death house" is vague and undefined. Because Plaintiff failed to define this term, Defendants will adopt their own definition in responding to this request and assert that information may be excluded if Plaintiff's understanding of the term is broader than the Defendants' understanding.

Defendants interpret the term "death house" to include the execution chamber, the pre-execution holding area, and the two witness viewing rooms.

Subject to these objections, Defendants admit that TDCJ provides a security escort for all non-employees who enter the death house on the evening of an execution.

**REQUEST FOR ADMISSION NO. 47:**

Admit that TDCJ conducts a criminal background check on every spiritual advisor.

**Response:**    Defendants deny.  TDCJ conducts a criminal background check on spiritual advisors that an inmate has requested to be present in the execution chamber during the inmate's execution. Background checks are not typically conducted for spiritual advisors who visit inmates in prison for reasons other than to attend an execution.

**REQUEST FOR ADMISSION NO. 48:**

Admit that TDCJ did not consult with any other correctional agency (state or federal) when considering the policy choice it made on April 2, 2019, to ban spiritual advisors from the executionchamber.

**Response:**    Defendants assert that responsive information is not discoverable because it is protected by the attorney-client communication privilege and the work-product privilege. Defendants further assert that responsive information is not discoverable pursuant to the deliberative process privilege. The deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations, and deliberations comprising part

of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The privilege applies to a document that is both pre-decisional and deliberative. *Id.* To the extent there are responsive documents and communications discussing the pre-decision, deliberation, or recommendations of changing the execution protocol, they are privileged and not discoverable. Any responsive documents that reflect the final decision and are not deliberative, will be produced.

Defendants withhold explanation based on the privileges and objections asserted above and cannot admit or deny.

## REQUEST FOR ADMISSION NO. 49:

Admit that TDCJ did not consult with any other correctional agency (state or federal) when considering the policy choice it made to prohibit non-employee spiritual advisors from audible prayer and physical contact with the condemned in the execution chamber.

**Response:** Defendants assert that responsive information is not discoverable because it is protected by the attorney-client communication privilege and the work-product privilege. Defendants further assert that responsive information is not discoverable pursuant to the deliberative process privilege. The deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The privilege applies to a document that is both pre-decisional and deliberative. *Id.* To the extent there are responsive documents and communications discussing the pre-decision, deliberation, or recommendations of changing the execution protocol, they are privileged and not discoverable. Any responsive documents that reflect the final decision and are not deliberative, will be produced.

Defendants withhold explanation based on the privileges and objections asserted above and cannot admit or deny.

## REQUEST FOR ADMISSION NO. 50:

Admit that TDCJ did not email, mail, or otherwise contact any other correctional agency (state or federal) over the past five (5) years to discuss execution procedures pertaining to spiritual advisors or chaplains in the execution chamber.

**Response:** Defendants assert that responsive information is not discoverable because it is protected by the attorney-client communication privilege and the work-product privilege. Defendants further assert that responsive information is not discoverable pursuant to the deliberative process privilege. The deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The privilege applies to a document that is both pre-decisional and deliberative. *Id.* To the extent there are responsive documents and

communications discussing the pre-decision, deliberation, or recommendations of changing the execution protocol, they are privileged and not discoverable. Any responsive documents that reflect the final decision and are not deliberative, will be produced.

Defendants withhold explanation based on the privileges and objections asserted above and cannot admit or deny.

## REQUEST FOR ADMISSION NO. 51:

Admit that TDCJ has not assessed whether the execution chamber could be reconfigured, rebuilt,or moved elsewhere in the prison.

**Response:** Defendants deny. The execution chamber was reconfigured following the April 21, 2021, change to the execution policy.

## REQUEST FOR ADMISSION NO. 52:

Admit that TDCJ has consulted an expert for inspection, tests, writings, drawings, graphs, charts,recordings, or opinions in connection with this or previous RLUIPA actions related to executions.

**Response:** Defendants deny.

## REQUEST FOR ADMISSION NO. 53:

Admit that Plaintiff Ramiro Felix Gonzales is an inmate at the Polunsky Unit.

**Response:** Defendants admit that Plaintiff Ramiro Felix Gonzales is an inmate in TDCJ custody, who is currently housed at the Polunsky Unit.

## REQUEST FOR ADMISSION NO. 54:

Admit that Plaintiff Ramiro Felix Gonzales requested in his Grievance forms that his spiritual advisor be allowed to audibly pray and physically touch him in the execution chamber.

**Response:** Defendants admit as to Gonzales' Step 1 and Step 2 Grievance #2021058851.

## REQUEST FOR ADMISSION NO. 55:

Admit that Plaintiff Ramiro Felix Gonzales asserted in his Grievance forms that the First Amendment and RLUIPA protects his free exercise right to audible prayer and physical touch in the execution chamber.

**Response:** Defendants admit as to Gonzales' Step 1 and Step 2 Grievance #2021058851.

**REQUEST FOR ADMISSION NO. 56:**

Admit that documents 001 through 028 are true and authentic copies of genuine original documents.

**Response:**     Defendants admit.

**REQUEST FOR ADMISSION NO. 57:**

Admit that documents 001 through 028 were made at or near the time of the regularly conductedactivity to which the documents pertain.

**Response:**     Defendants admit as to documents 001–012 and 021—028. Defendants partially admit as to documents 013–020 as to the grievance responses only. Defendants can neither admit nor deny as to the handwritten portions of documents 013–020 because these documents are Plaintiff's grievances, which were written by the Plaintiff. Although they are now in the custody of TDCJ and are kept and maintained in the regular course of business, Defendants have no knowledge of when Plaintiff wrote them.

**REQUEST FOR ADMISSION NO. 58:**

Admit that documents 001 through 028 were made by a person with knowledge of the activity to which the documents pertain or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**Response:**     Defendants admit as to documents 001–012 and 021—028. Defendants partially admit as to documents 013–020 as to the grievance responses only. Defendants can neither admit nor deny as the handwritten portions of documents 013–020 because these documents are Plaintiff's grievances. Although they are now in the custody and control of TDCJ and are kept and maintained in the regular course of business, they were "made" by the Plaintiff.

**REQUEST FOR ADMISSION NO. 59:**

Admit that documents 001 through 028 were prepared and kept by the Defendants in the course oftheir regularly conducted activity of the Defendants.

**Response:** Defendants admit as to documents 001–012 and 021—028. Defendants partially admit and partially deny as to documents 013–020 because these documents are Plaintiff's grievances. Defendants admit insofar as the grievance responses are "prepared" by TDCJ employees and admit insofar as the records are "kept" by TDCJ in the regular course of business, but deny that the hand written portion of the grievances were prepared by the Defendants or any other TDCJ employee.

**REQUEST FOR ADMISSION NO. 60:**

Admit that documents 001 through 028 were made in the regular practice of the activity to whichthe documents pertain.

**Response:**    Defendants admit as to documents 001–012 and 021—028. Defendants partially admit and partially deny as to documents 013–020 because these documents are Plaintiff's grievances. Defendants admit insofar as the grievances responses are "made" by TDCJ employees, but deny that the hand written portion of the grievances were "made" by the Defendants or any other TDCJ employee.

**REQUEST FOR ADMISSION NO. 61:**

Admit that all foundational requirements for the admission of documents 001 through 028 have been satisfied.

**Response:**    Defendants object to this request as improper. Defendants neither admit nor deny the admissibility of records under the Federal Rules of Evidence. Further, the offering party bears the burden of laying the proper foundation of a record for purposes of admissibility. Defendants are not attempting to admit evidence for any purpose at this time.

# EXHIBIT 2

<u>Report of Mark Heath, MD</u>

May 26, 2022

I have been asked by counsel for Mr. Ramiro Gonzales to provide an opinion about the risks of physical contact between a spiritual advisor and a condemned prisoner during execution by lethal injection.

I am a full-time practicing anesthesiologist at Columbia University Medical Center in New York City. My clinical focus is on providing anesthetic care for patients undergoing heart and lung surgery. I have a current medical license in NY State and I am board certified in Anesthesiology. I am familiar with all aspects of providing general anesthesia, including the use of intravenous (IV) anesthetic drugs, the procedures for obtaining IV access, and the safe management of IV equipment such IV tubing (aka IV lines).

Over the past 20 years I have also focused on the use of medical technology and practices to achieve execution by lethal injection. I have served in as an expert witness and or consultant in numerous legal cases regarding the practice of lethal injection by numerous states and the federal government. As a result of participating in litigation:

-- I have inspected lethal injection facilities in Missouri, Connecticut, California, Maryland, Delaware, Arizona, Nevada, North Carolina, Alabama, and the Federal facility in Terre Haute, Indiana. Many of these inspections included a demonstration of the conduct of lethal injection by the prison staff, including placing a live person or mannequin on the gurney, simulating the placement and path of IV lines, demonstrating the location of execution personnel within the drug room and death chamber, and demonstration of the injection process (using saline rather than actual drugs).

-- During litigation in a different case I was given an in-person briefing and tour of the execution Texas lethal injection facility by the Warden of the Huntsville Unit. The Warden and his staff demonstrated a high level of professionalism and dedication, provided a detailed description of the procedures and safeguards, and answered all questions in a highly knowledgeable and thorough manner.

-- I attended the lethal injection of Russell Bucklew in Missouri in 2019.

-- I have performed medical examinations on prisoners before execution, and after failed executions (Romell Broom (Ohio) and Doyle Hamm (Alabama)).

-- I have heard testimony and reviewed depositions from prison personnel and witnesses regarding numerous problematic lethal injection procedures.

-- I have paid particular attention to the issue of obtaining, maintaining, and managing IV access and IV lines, because this aspect of the procedure is a significant source of risk and actual problems during executions.

In preparing this report I have reviewed photos of the Texas lethal injection facility. I have also reviewed Mr. Gonzales' grievances requesting physical contact with Reverend Swan, legal filings related to this case, the US Supreme Court decision in Ramirez v. Collier, audio recording of the oral argument for that case, and I have reviewed the execution protocol governing Texas executions.

The induction of general anesthesia in a clinical operating room is in some ways similar to execution by lethal injection. Both situations involve intravenous access, intravenous lines, and the injection of

1

sedative or anesthetic drugs to produce unconsciousness. I am confident that I am sufficiently familiar with both environments to serve the courts by providing useful and accurate opinions regarding risk and safety considerations in these settings.

With respect to the present case, it is my understanding that Mr. Ramiro Gonzales and his Spiritual Advisor Reverend Bri-Anne Swan are requesting that as part of her ministration she place one hand over his heart and one hand holding his hand during the time that he is secured to the gurney, both before and during the administration of pentobarbital. Based on my clinical experience of bringing parents and guardians/caregivers into operating rooms, and based on my knowledge of veterinary anesthesia and euthanasia, and based on my experience and knowledge about lethal injection executions, it is my opinion that accommodation of Mr. Gonzales' and Reverend Swan's request would present no meaningful risk of interfering with the lethal injection procedure, and would, if anything, provide a calming and soothing effect that would tend to cause the process to unfold more smoothly.

Texas has conducted more executions by lethal injection than any other state, the federal government or nation. Its execution staff are experienced and proficient, and mishaps are accordingly vanishingly rare. The execution system in Texas is a "well-oiled machine".

Unlike some other states that incorporate agonizing drugs such as pancuronium/vecuronium/rocuronium (chemical paralytics) and potassium, Texas uses only the anesthetic drug pentobarbital. Because other states incorporate agonizing drugs in their protocol, a failure to first adequately anesthetize the prisoner would result in an agonizing death. By contrast, if in Texas there is an inadvertent (or deliberate) interruption during the administration of pentobarbital, the prisoner would be subjected to a sub-lethal dose and would experience drowsiness, not agony. In view of this, the Texas lethal injection procedure is resilient to any accidental or deliberate interference or disruption.

In my clinical practice I sometimes care for patients with intellectual disability. For example, it is common for people with Down Syndrome to need surgical repair of congenital cardiac disease. Some of these patients are very anxious when they are brought to the hospital, and have difficulty cooperating with me while I place an IV and induce anesthesia. In cases like this, I find it very helpful if the parent or guardian/caregiver who is familiar to the patient accompanies us into the operating room and comforts and distracts the patient while I do the things I need to do. I am comfortable, and indeed find it helpful, it the parent holds the arm or hand, even if the IV is situated in that location. By holding the arm or hand where the IV is placed it stabilizes the IV and make it less likely to be pulled out if my patient is agitated and has difficulty keeping still. While there is a minute risk that the parent might accidentally get in my way, this risk is greatly outweighed by the benefit they provide in calming my patient and smoothing the overall situation. In practice I have never experienced any interference or disruption from having a parent in the operating room during the preparation and induction of anesthesia, and have always found it to be helpful and have appreciated their participation and assistance. I acknowledge the theoretical risk that a parent in the operating room might accidentally (or deliberately) disrupt my activities, but in practice this has never happened, the risk is negligible, and instead their presence has been helpful to me and to my patients.

Because I practice in a teaching hospital, I sometimes have junior medical students come into the operating room as an introduction to the surgical and anesthetic practice. In my experience medical students garner the most benefit when they participate in patient care, so I typically show them how to

perform elementary tasks such as applying EKG leads, blood pressure cuffs, and pulse oximeters. During this time I also appreciate it if the medical students engage with my patients, distract them with conversation, and demonstrate their caring disposition. When it comes time to induce general anesthesia, I typically explain the mechanics of IV lines, drip chambers, flow regulators, syringes, and stopcocks, and I often allow them to inject anesthetic and vasoactive drugs under my close and direct supervision. It is by administering these drugs that medical students gain an understanding of their properties and effects. The didactic benefit of allowing and encouraging medical students to participate in anesthetic care is obvious, but acknowledge a minute theoretical risk that they could accidentally (or deliberately) interfere with my practice. However, in the many times I have included medical students in my practice, I have never experienced any interference or disruption. As a matter of reality, it simply is not a problem. Indeed, it is overall helpful to have a medical student with me, and I am confident that when they interact with my patients it is calming and pleasant for them.

I have also participated in veterinary anesthesia and euthanasia, and have experienced that it is helpful to have the assistance of a person who is dedicated to calming and distracting the animal during the placement of the IV and administration of the drugs.

The Texas execution protocol states that Spiritual Advisors who attend executions will undergo background checks and will take a mandatory 2 hour orientation/training session. I do not know the content or curriculum of this session, but given the experience and professionalism of the Texas execution personnel that I encountered, I am confident based on my knowledge of their deep expertise that the training will impart the important and necessary information to ensure that there is no disruption of the execution.

It is simple and practicable for Texas to take measures to protect and secure the IV lines from accidental disruption or interference by Reverend Swan. Such measures can include secure taping of the IV lines to the Mr. Gonzales' arms and/or gurney, and covering the IV lines with a sheet or drape. In my practice I undertake such measures to ensure that my IV lines are secure and safe for the induction of anesthesia.

It is possible to imagine that, impelled by a sense of spiritual duty, a Spiritual Advisor might plan to sabotage an execution by, for example, deliberately attempting to pull out an IV line. Based on my knowledge of lethal injection procedures and my experience with lay people in operating rooms, this probability of such an event occurring is vanishingly low. It simple and prudent for the Texas execution team to firmly secure the IV lines with tape and to cover them with a sheet or drape. While I do not have knowledge of criminal sanctions, it seems obvious that any action of sabotage would subject Reverend Swan to substantial criminal penalties that would serve as a deterrent. Further, by allowing her to be situated adjacent to the gurney, the prison has already incorporated and assumed any remote risk that Reverend Swan would be deliberately disruptive. Because it is required that she have an ongoing relationship with Mr. Gonzales I believe that her character and demeanor would be known to the prison staff, and I believe that as prison professionals they are experienced at reading the integrity and intentions of visitors and outsiders. I expect that they would apply a similar or indeed higher level of scrutiny to any potential participant than I would apply to a parent or medical student who would be present in my operating room while I induced general anesthesia.

One very important consideration is that the execution team ensures that Reverend Swan is situated in a location that affords a clear line of view for the personnel in the drug administration room. The personnel in the drug room need to be able to see the effects of the pentobarbital on Mr. Gonzales and

need a clear view of the path of the IV sites and the lines running from their room to the gurney. Based on my inspection of the Texas lethal inspection facility, and based on photographs provided to me, unless she is has an extraordinarily large build/body, Reverend Swan can stand or sit immediately adjacent to Mr. Gonzales' shoulder without impeding the views of the personnel in the drug room.

In summary, based on my knowledge about lethal injection executions, and based on my experience with bringing lay people into the my operating rooms, and based on my confidence in the experience and high professionalism of the Texas execution personnel, I am confident that it is reasonable and safe for Reverend Swan to minister to Mr. Gonzales by resting a hand on his chest over his heart and hold his hand prior to and during the administration of the lethal drug. Further, I expect and believe that by comforting Mr. Gonzales and ministering to him, Reverend Swan will provide a calming effect on him and the execution team members that, on balance, will increase the likelihood of the procedure unfolding in a smooth fashion.

I hold this opinion to a high degree of certainty and hope that this report is helpful to the Court in deciding this issue.

_____
Mark Heath, MD

**ATTACHMENT 1**

**QUALIFICATIONS**

My curriculum vitae is attached as Attachment 2.

**PUBLICATIONS**

My curriculum vitae lists my publications in Section 16.

**PRIOR TESTIMONY**

To the best of my recollection, in the last four years I have only testified in one case. That was in Nevada, in *Floyd v. Daniels*, 3:21-cv-176.

**STATEMENT OF COMPENSATION**

I am retained by the Office of the Federal Public Defender for the Northern District of Texas, counsel for Ramiro Gonzales. My hourly rate is $500 per hour.

Curriculum Vitae

1)  Date of preparation: June 21, 2021

2)  Name:                Mark J. S. Heath

    Birth date:          March 28, 1960
    Birthplace:          New York, NY
    Citizenship:         United States, United Kingdom, Italy

3)  Academic Training:

    Harvard University                          B.A., Biology, 1983

    University of North Carolina, Chapel Hill M.D., 1987

    Medical License                             New York: 177101-1

4)  Traineeship:

    1987 – 1988  Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

    1988 – 1991  Residency, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

    1991 – 1993  Fellowship, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

5)  Board Qualification:

    Diplomate, American Board of Anesthesiology, October 1991.
    Diplomate National Board of Echocardiography Perioperative Transesophageal Echocardiography 2005. (PTEeXAM 2001).

6)  Military Service:           None

7)  Professional Organizations:

    None

8)  Academic Appointments:

    1993 – 2002      Assistant Professor of Anesthesiology, Columbia University, New York, NY

2002 - present      Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9)     Hospital/Clinical Appointments:

1993 – present     Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY.

10)     Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11)     Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH   KO8 "Inducible knockout of the NK1 receptor" Principal Investigator, KO8 funding 12/98 - 11/02, $431,947 over three years
(no-cost extension to continue through 11/30/2002)

NIH   RO1 "Tachykinin regulation of anxiety and stress responses" Principal Investigator, funding 9/1/2002 – 8/30/2007 $1,287,000 over 5 years

12)     Departmental and University Committees:

Research Allocation Panel (1996 – 2001)

Institutional Review Board (Alternate Boards 1-2, full member Board 3) (2003 - present)

13)     Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

Anesthetic considerations of LVAD implantation. Recurrent lecture at Columbia University LVAD implantation course.

Invited Lectures:

NK1 receptor functions in pain and neural development, Cornell University December 1994

Anxiety, stress, and the NK1 receptor, University of Chicago, Department of Anesthesia and Critical Care, July 2000

Anesthetic Considerations of LVAD Implantation, University of Chicago, Department of Anesthesia and Critical Care, July 2000

NK1 receptor function in stress and anxiety, St. John's University Department of Medicinal Chemistry, March 2002

Making a brave mouse (and making a mouse brave), Mt.Sinai School of Medicine, May 2002

NK1 receptor function in stress and anxiety, Visiting Professor, NYU School of Medicine, New York, New York. October 2002.

Problems with anesthesia during lethal injection procedures, Geneva, Switzerland. Duke University School of Law Conference, "International Law, Human Rights, and the Death Penalty: Towards an International Understanding of the Fundamental Principles of Just Punishment". July 2002.

Anesthetic Depth, Paralysis, and other medical problems with lethal injection protocols: evidence and concerns, Federal Capital Habeas Unit Annual Conference, Jacksonville, Florida. May 2004.

Medical Scrutiny of Lethal Injection Procedures. NAACP Legal Defense Fund, Airlie Conference Center, Warrenton, Virginia. July 2004.

Ethical Issues of Lethal Injection Procedures Advanced Criminal Law Seminar 2005, Fordham University School of Law, March 2005

Execution Pharmacology: Lethal Injection and the Law. CUNY Law School. April 2005.

Medical Scrutiny of Lethal Injection Procedures, Update 2005. NAACP Legal Defense Fund, Airlie Conference Center, Warrenton, Virginia, July 2005.

Medical *Scrutiny of Lethal Injection Procedures,* Update 2006. NAACP Legal Defense Fund, Airlie Conference Center, Warrenton, Virginia.  July 2006.

Medical Scrutiny of Lethal Injection Procedures  Advanced Criminal Law Seminar, Fordham University School of Law, January 2007

EEG and consciousness during execution by lethal injection. Neuroethics Seminar, Columbia University.  February 2007.

Problematic executions.  Physicians for Human Rights, Princeton University.  April 2007.

Medical *Scrutiny of Lethal Injection Procedures.* Update 2007. NAACP Legal Defense Fund, Airlie Conference Center, Warrenton, Virginia.  July 2007

Technical Challenges to Execution by Lethal Injection. Department of Medicine Grand Rounds, Columbia University, September 2007.

Induced Participation: Medical Professionals and Execution by Lethal Injection.  4th Year Medical Student Ethics discussion. October 2007.

Physician Participation in Lethal Injection.  Physicians for Human Rights Invited Speaker.  Mount Sinai School of Medicine, November 2007.

Execution by Lethal Injection:  Medical Update.  Advanced Criminal Law Seminar, Fordham University School of Law, January 2008

Lethal Injection – a field report.   The Supreme Court and the Legal, Medical, and Ethical Challenges to Execution by Lethal Injection, Columbia University Symposium. January 2008

Medical Mechanics of Lethal Injection.  University of Michigan Law School, Ann Arbor.  March 2008.

Current Controversies in Execution by Lethal Injection. *Fordham* Urban *Law.* Journal *Symposium*, The *Lethal Injection*

Debate: *Law* and Science, *Fordham* University. School of *Law. March 2008*

Medical and Legal Challenges to Execution by Lethal Injection.  Cornell Law School.  April 2008.

Lethal Injection: both a medical and a non-medical procedure.  University of North Carolina, Chapel Hill, April 2008

Execution by lethal injection: Medical mechanics and ethics, National Institutes of Health Grand Rounds, May 2008

Anesthesia, Consciousness, and Execution by Lethal Injection.  Psychiatry, Law, and Ethics Seminar.  Columbia University Medical Center. October 2008.

Ethical dimensions of physician participation in execution by lethal injection.  American Society for *Bioethics* & Humanities. October 2008.

Update on Lethal Injection.  Physicians for Human Rights, Columbia University Medical Center.  November 2008.

Execution by lethal injection: Medical mechanics and ethics. Physicians for Human Rights, Columbia Unversity Medical Center. April 29, 2010.

Fordham University School of Law.      Lethal injection, an Update.  April 5, 2011.

Albert Einstein College of Medicine.    Execution by lethal injection: Medical mechanics and ethics  April 25, 2012.

Albert Einstein College of Medicine.    Lethal injection: Participation of Health Care Providers and Ethical Considerations. January 9. 2013.


14)    <u>Requested/Invited Live Testimony before Governmental Bodies regarding Lethal Injection:</u>

Nebraska Senate Judiciary Committee, Omaha.  November 2002

Maryland House Judiciary Committee, Annapolis. February 2007

Maryland Senate Judiciary Committee, Annapolis. February 2007

Pennsylvania House Judiciary Committee, Harrisburg. March 2006

South Dakota House Committee, Pierre. February 2007

Nebraska Senate Judiciary Committee, Omaha. January 2009

Florida: The Governor's Commission on Administration of Lethal Injection, Tampa. February 2007

House of Lords, London, U.K. Regarding legislation governing the exportation of drugs used for lethal injection. February 2010


15)    Grant Review Committees:None

16)     Publications:

**Original peer reviewed articles**

**Heath, M.J.S.** (2008). Revisiting physician involvement in capital punishment: medical and nonmedical aspects of lethal injection. Mayo Clinic Proceedings. Jan;83(1):115-6

**Heath, M. J. S.**, Stanski DR, Pounder DJ.  Inadequate Anesthesia in Lethal Injection for Execution.  Lancet, 366(9491) 1073-4, correspondence.  2005

Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. **Proc. Nat. Acad. Sci**., 98(4), 1912 – 1917.

King, T.E. $^\delta$, **Heath M. J. S$^\delta$.**, Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91     δ authors contributed equally to this work

**Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J.  (1995).  Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. **Journal of Physiology** 486.1, 139 -148.

**Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994).  Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. **Journal of Neurophysiology** 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S**., Gelber, S., DeVay, P., Role, L.W.  (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. **Science** 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S**., Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S**., Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. **Neuron** 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995).  Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. **Journal of Physiology** 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H. (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. **Journal of Physiology**: 502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994). Characterization of a novel tumor-derived cytokine. **Journal of Biological Chemistry** 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M. (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. **Cold Spring Harbor Symposia of Quantitative Biology** 48, 685 -695.

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S.**, Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. **Journal of  Clinical Investigation** 97(2), 493 - 500.

Heath, M.J.S.  (2008). Revisiting Physician Involvement in Capital Punishment:  Medical and Nonmedical Aspects of Lethal Injection.  Mayo Clinic Proceedings 83(1):115-117.

**Case reports**                              none

**Review, chapters, editorials**

*        **Heath, M. J. S.**, Dickstein,  M. L. (2000).  Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

*        Dickstein, M.L., Mets B, **Heath M.J.S**. (2000).  Anesthetic considerations during left ventricular assist device implantation.  Cardiac Assist Devices pp 63 – 74.

*        **Heath, M. J. S.** and Hen, R. (1995). Genetic insights into serotonin function. **Current Biology** 5.9, 997 -999.

*        **Heath, M.J.S.**, Mathews D. (1990).  Care of the Organ Donor.  **Anesthesiology Report** 3, 344-348.

*        **Heath, M. J. S.,**  Basic physiology and pharmacology of the central synapse. (1998) **Anesthesiology Clinics of North America** 15(3), 473 - 485.

**Abstracts**

**Heath, M.J.S.** (2010).  Thiopental Toxicology in Execution by Lethal Injection: The Role of Post-Mortem Redistribution  Anesthesiology 95:A-868.

Heath, M.J.S., Analysis of EKG recordings from executions by lethal injection.  Canadian Society of Anesthesiology Winter Meeting, February 2006.

Heath, M.J.S., Analysis of postmortem thiopental in prisoners executed by lethal injection  IARS Congress 2005.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  IARS American-Japan Congress A-15.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  Anesthesiology 95:A-811.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

**Heath, M.J.S.,** Santarelli L, Hen H. (2001)  The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus. Anesthesia and Analgesia 92; S233.

**Heath, M.J.S.,** Santarelli L, Debs P, Hen H. (2000).  Reduced anxiety and stress responses in mice lacking the NK1 receptor.  Anesthesiology 93: 3A A-755.

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000).  NK1 receptor gene disruption alters the development of nociception.  Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997).   Delineation of spinal cord glial subpopulations expressing the NK1 receptor.  Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992).  Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties.  Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994).  Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord.  Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons.  Anesthesiology 75; 3A; A1037.

# EXHIBIT 3

# DECLARATION OF RAMIRO GONZALES

1. My name is Ramiro Felix Gonzales. I am currently incarcerated at the TDCJ-Polunsky Unit under a sentence of death. I am the plaintiff in this case.

2. I am a Messianic Christian. Over the years, I have completed various religious courses and obtained certificates for completing them. This includes correspondence study courses with Shalom Bible College.

3. Reverend Bri-anne Swan is my spiritual advisor. I have requested that she be present in the chamber during my execution. As part of my religious beliefs, I have requested that she pray over me, hold one of my hands, and place her other hand on my chest over my heart during my execution.

4. I have asked for this because it is important to my religious beliefs. Receiving God's touch is a sacred concept in the Bible and even the lepers were touched by God. The specific physical contact I have requested is vitally important to me as I am making my spiritual transition into the paradise of God. Allowing Reverend Swan to hold one of my hands and place her other hand over my heart will provide a sense of tranquility and she will serve as a representative of Christ in the physical form in the execution chamber as I pass into God's Kingdom.

5. I am aware that TDCJ now states they will permit Reverend Swan to pray and place one hand over my heart, but that they will not permit her to hold my hand.

6. The specific contact locations that I have requested, the heart and hand, are deeply important to my religious beliefs. My spiritual needs will not be satisfied by allowing Reverend Swan to be in physical contact with other parts of my body or to only place a hand over my heart.

7. It is important to my religious beliefs for Reverend Swan to place a hand over my heart during my execution. The Bible tells us to believe in God with all of our heart. Spiritually, your heart is the most important organ. Having Reverend Swan place a hand over my heart as it stops beating is important because it will allow her, as Christ's representative in this world, to physically bear witness to my passing into the Kingdom of God.

8. It is equally important to my religious beliefs that she holds one of my hands during my execution. There is a long Biblical tradition about the importance of laying hands. In some instances, Jesus or his followers touched the hand of people

they performed miracles on. Two examples of this are in Matthew Chapter 8, Verses 14-15 and Mark Chapter 5, Verse 41. Reverend Swan holding my hand is important to allow her to bless me as I transition into the Kingdom of God. Because Reverend Swan is God's representative on Earth, her holding my hand is as if God is holding my hand, in the same way that Jesus did for those in the Bible that He performed miracles on. Reverend Swan taking my hand as God's representative is like God welcoming me into His Kingdom as I pass.

9. I also believe that I am God's representative on Earth. Being able to hold Reverend Swan's hand while I am passing allows me to physically feel the blessing she is providing me as I pass in a way that other contact would not.

I declare under penalty of perjury that the forgoing is true and correct. Executed on June 16, 2022.

RAMIRO GONZALES

| From: | Leah O"Leary |
|---|---|
| To: | Jeremy Schepers; Collis, Steven T |
| Cc: | Jenna Schmidt |
| Subject: | RE: Gonzales v Collier |
| Date: | Wednesday, June 15, 2022 8:02:14 AM |
| Attachments: | image001.png |

Jeremy, TDCJ has declined your request. MSJs have already been filed, we are past the discovery period, and we are close to the trial date.

Recall that we have produced multiple sets of photographs of the execution chamber and gurney, including photographs of a person pretending to hold the hand and lay a hand on the chest. We have also produced the video tour of the execution chamber which depicts the chamber and gurney from every angle.

Thank you.

*Leah O'Leary*
Deputy Chief-Law Enforcement Defense Division
Office of the Attorney General of Texas
Leah.Oleary@oag.texas.gov
Phone: 512-936-1292



**From:** Jeremy Schepers <Jeremy_Schepers@fd.org>
**Sent:** Tuesday, June 14, 2022 10:37 AM
**To:** Leah O'Leary <Leah.OLeary@oag.texas.gov>; Jenna Schmidt <Jenna.Schmidt@oag.texas.gov>; Collis, Steven T <steven.collis@law.utexas.edu>
**Subject:** Gonzales v Collier

Leah,

Reverend Swan, Mr. Gonzales's spiritual advisor, will be in Huntsville next week to complete her spiritual advisor orientation training. One of the contentions in this case is that, if Mr. Gonzales's request is accommodated, Reverend Swan would then be in a position where she would obstruct the view of the witnesses and/or Warden Crowley. To determine how much obstruction would occur, I wanted to see if we could find an agreed time where Reverend Swan and the parties could

go to the execution chamber and take video and photos of what level of obstruction would actually occur if the request was accommodated. I believe that will provide helpful information to the court as it is determining how to resolve this lawsuit.

If this is a possibility, I can try coordinate with Reverend Swan to propose possible dates and times.


Jeremy Schepers
Supervisor, Capital Habeas Unit
Northern District of Texas
(214) 767-2746