United States District Court
Southern District of Texas
**ENTERED**
July 05, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAMIRO FELIX GONZALES, | § | CIVIL ACTION NO. |
| | § | 4:21-cv-00828 |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| BRYAN COLLIER, *et al*, | § | |
| Defendants. | § | |

OPINION AND ORDER
ON ISSUANCE OF PRELIMINARY INJUNCTION

Plaintiff Ramiro Felix Gonzales is an inmate convicted of a capital offense in Texas. He faces an execution date of July 13, 2022. He asserts religious liberty claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act, 42 USC § 2000cc *et seq*, referred to hereafter as *RLUIPA*.

The motion by Gonzales for a preliminary injunction under RLUIPA is granted. Dkt 59. For reasons specified below, the State of Texas may proceed with Gonzales' scheduled execution only if he's allowed his requested religious accommodations, being that his spiritual advisor is permitted to hold his hand, place another hand on his chest, and audibly pray during and at the time of execution.

1. Background

Ramiro Felix Gonzales seeks narrow relief with respect to certain religious accommodations that he believes to be important during his impending execution. No question is presented as to his guilt or innocence or whether he's deserving of capital punishment. But his request for a preliminary injunction requires a balance of equities and interests. An appreciation of his crime and litigation

history is thus in order. Likewise important to the merits is a detailed understanding of the execution chamber.

> a. Underlying crime and related appeals

In contrast to the accommodations that Gonzales seeks here, his victim died alone in fear and agony, far from the comfort and solace of any minister or family member. The Fifth Circuit has recounted his crime this way:

> On January 15, 2001, Gonzales went to the home of his drug supplier, hoping to steal cocaine. Only his supplier's girlfriend, Bridget Townsend, was at the home, so he tied her up and stole what cash he could find, but did not find any drugs. He then carried the bound Townsend to his pickup truck, drove her out to the large ranch on which he lived, retrieved a hunting rifle, and marched Townsend out into the deserted brush. When he started loading the rifle, Townsend told Gonzales that she would give him money, drugs, or sex if he would spare her life. In response, Gonzales unloaded the rifle and took Townsend back to his truck, where he had sex with her. After she dressed, he reloaded the rifle, walked her back into the brush, and shot her. He left her body where it fell. Gonzales eventually confessed to his crimes.

*Gonzales v Stephens*, 606 F Appx 767, 768 (5th Cir 2015, *per curiam*).

Gonzales was tried by a Texas jury in 2006. The State there presented evidence of his significant criminal history apart from the murder. This included previous convictions for aggravated kidnapping, aggravated sexual assault, felony theft, forgery, and burglary of a habitation. See *Gonzales v Stephens*, 2014 WL 496876, *3 (WD Tex) (recounting evidence presented). The jury convicted Gonzales of murder and sentenced him to death.

2

Gonzales has since unsuccessfully challenged his conviction and sentence in state court. The Texas Court of Criminal Appeals affirmed on direct appeal. *Gonzales v Texas*, 2009 WL 1684699, *1 (Tex Crim App). His state application for relief on *habeas corpus* was denied. *Ex parte Gonzales*, 2012 WL 2424176, *1 (Tex Crim App, *per curiam*). And a subsequent application for relief on *habeas corpus* was denied as an abuse of the writ. *Ex parte Gonzales*, 2012 WL 340407, *1 (Tex Crim App, *per curiam*).

Gonzales has also unsuccessfully sought review in federal court. The United States District Court for the Western District of Texas denied his federal petition for a writ of *habeas corpus* in 2014. *Gonzales v Stephens*, 2014 WL 496876 at *46. The Fifth Circuit affirmed in 2015. *Gonzales v Stephens*, 606 F Appx 767, 775 (5th Cir 2015, *per curiam*); see also *Gonzales v Davis*, 788 F Appx 250, 254 (5th Cir 2019, *per curiam*) (affirming denial of relief under Rule 60(b)(6)).

b.  Action for religious accommodation

This litigation is unrelated to the merits of Gonzales' conviction or the justness of the death penalty in relation to his crime and criminal history. It traces back to his application to the Texas Department of Criminal Justice for a religious accommodation in January 2021. He requested that his spiritual advisor, Reverend Bri-anne Swan, be present at his execution, hold his hand, place her other hand over his heart, and pray out loud. See Dkts 72-1 & 72-2. TDCJ denied that request. Dkt 1-1 at 28–29.

Gonzales brought this action on March 12, 2021. Named as defendants are Bryan Collier as Executive Director of the Texas Department of Criminal Justice, Bobby Lumpkin as Director of the Texas Department of Criminal Justice—Correctional Institutions Division, and Dennis Crowley as Warden of the Huntsville Unit. Dkt 1. Warden Crowley has recently stepped down from that post, but he's still expected to be present at Gonzales' execution if it proceeds as scheduled. These men are all named in their official capacities within divisions of the Texas

Department of Criminal Justice. As such, they and their agency will be referred to together as *TDCJ*.

Gonzales' execution date has been rescheduled twice since he filed this action. Dkts 9 & 21. And in that time, Texas has modified its execution protocol. TDCJ denied Gonzales' original request because its policy at the time didn't allow spiritual advisors into the execution chamber. But on April 21, 2021, TDCJ adopted a new protocol that would allow an inmate's chosen spiritual advisor into the chamber. TDCJ officials also determined that the new protocol precluded physical touch and audible prayer by the spiritual advisor, although that wasn't specifically addressed by that change. Dkt 72-3; see also Dkt 81 at 13. With that change, the State moved for partial dismissal on a range of issues. Dkt 10; see also Dkt 15 at 5–6. That motion was granted on September 22, 2021, and all claims were dismissed except those involving what a spiritual advisor may do in the execution chamber. Dkt 20.

The remaining issues in this case came into sharper focus with the decision by the Supreme Court in *Ramirez v Collier* on March 24, 2022. It was there determined under a preliminary-injunction standard that a condemned inmate would likely succeed on the merits of his RLUIPA claim by which he sought both touch and prayer during execution. 142 S Ct 1264, 1280–81 (2022). The Supreme Court also observed that States should "adopt clear rules" regarding religious expression in the execution chamber in order to prevent "last-minute resort to the federal courts." Id at 1283.

Texas hasn't yet responded with a formal policy change. See Dkt 81 at 13. It instead appears that Director Lumpkin and the Warden of the Huntsville Unit will make a case-by-case assessment of what religious requests TDCJ will honor. Id at 14. Gonzales also notes that accommodations granted in advance of the execution can potentially be modified at the discretion of Director Lumpkin and the Warden in the moments immediately prior to the commencement of the execution. Id at 15–16 & 17–18; see also Dkt 51 at 22–23.

4

TDCJ acquiesced to two of Gonzales' requests after the *Ramirez* decision. Gonzales' spiritual advisor may now lay her hand on Gonzales' chest and pray aloud throughout the execution. But she still can't hold his hand. Dkt 81 at 17; see also Dkt 42 at 5–7. The reasons for this and the interests invoked by TDCJ are detailed below in the section on *compelling governmental interests*, but they essentially pertain to the security and integrity of the intravenous lines and to the need for certain lines of sight by a number of persons present within or immediately adjacent to the execution chamber.

Pending is a motion by Gonzales for partial summary judgment on the limited question of whether TDCJ's decision to prohibit his spiritual advisor from holding his hand substantially burdens his sincere religious exercise. Dkt 40. TDCJ filed a cross-motion for summary judgment to establish that Gonzales hasn't made the necessary showing under RLUIPA, arguing primarily that its present accommodations mean that no *substantial burden* on Gonzales' religious exercise exists. Dkt 42.

Trial to the bench was scheduled to commence on July 5, 2022. Dkt 36. That trial was continued by separate order issued yesterday, once it became clear that discovery and other logistical issues have overtaken the ability of the parties to be ready for and to fairly participate in trial on the merits as scheduled. Dkt 90.

In connection with a recent hearing on trial issues, Gonzales was instructed to bring any motion for preliminary injunction promptly, if desired. Dkt 57. He did so on June 24, 2022, moving for relief that would allow his execution to proceed so long as his requested religious accommodations are, in fact, observed during his execution. Dkt 59.

> c.  The Huntsville Unit execution chamber

At hearing on June 22, 2022, the parties agreed that an inspection visit by the undersigned to the execution chamber at the Huntsville Unit would be appropriate to this Court's consideration of the merits on preliminary

injunction, summary judgment, and trial. Dkt 57. That visit took place on July 1st. In attendance were the undersigned, lead counsel for both parties, Kelly Strong (the new Warden of the Huntsville Unit), and Kristen Worman (TDCJ General Counsel), among others.

The State submitted in summary judgment briefing the following diagram of the execution chamber:



Dkt 42 at 18. The parties don't dispute that this diagram generally maps the physical layout of the execution chamber accurately. But they vigorously dispute the possible placement of certain execution participants as indicated on the diagram—particularly that of Gonzales' spiritual advisor.

With consent of the parties, a TDCJ employee took various measurements requested by the Court and Gonzales' counsel during the inspection. These measurements were recorded to aid later argument and review of what, at the end of the day, comes down to practical considerations relating to security and logistics.

The execution chamber is an approximately nine-foot-by-twelve-foot rectangular-shaped room. As can be seen from the diagram, the execution gurney occupies a large portion of the room ▮▮▮▮▮▮▮▮▮▮▮▮▮. In

variance from the diagram, ████████████
████████████████████████████████
█████████████████████. Heavy
leather straps encircle the gurney in a number of locations
to restrain the inmate. ███████████████ ████
██████████████. ████████████ fabric-covered
cushioning pads the gurney's surface.

████████████████████████ The two
arm rests protrude ████████ from either side. Each arm
rest has a █████████████████████████
████████████████████████████████
████████████████████████████████
███ ██ ████ █████████ ███ ██████ █
███ ████ ████ ████ ███ ████ ████ ██
████████████



Dkt 89-2.

████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
██████████████████

On the wall to the right of the gurney are two windows providing visual access for separate viewing rooms. The one toward the head of the gurney allows the victim's witnesses and members of the media to view the execution. The one toward the foot provides viewing for the inmate's witnesses and additional media members. A wall ████████ separates the two rooms. Curtains in front of both windows can be closed at certain points of the execution process if necessary to address privacy or confidentiality concerns. Two microphones extend down from atop the left side of the room to capture any last words from the condemned inmate.

On the wall to the left side of the gurney toward the head is a door giving members of the medical team access to the chamber. These team members sit behind a one-way mirror on the left side of the gurney toward its foot. ██████████████████████ ██ ██████████████████████ ██ ██████████████████████ ██████████████████████ ████████████████.

Upon offer by TDCJ representatives for demonstrative purposes, a TDCJ employee laid upon the gurney with his arms outstretched ██████████████████ Gonzales is approximately 5 feet 2 inches tall. The TDCJ employee was 5 foot 6 inches. ████████████████████████

████████████████████████
████████████████████████
████████████████████████
████████████████████

8

Participants in the execution enter the chamber through a door to the right side behind the head of the gurney. Only four people in addition to the condemned inmate are within the chamber during the execution itself, being the Warden of the Huntsville Unit, the Director of the Custodial Institutions Division of TDCJ, a chosen spiritual advisor, and an officer from the Office of the Inspector General "whose sole role is to guard and observe the spiritual advisor while inside the chamber." Dkt 42 at 6; see also Dkt 81 at 12.

TDCJ submitted the above diagram with its briefing on summary judgment, showing positions of these individuals at the commencement of execution procedures according to current accommodations. ████

Not represented in the diagram is orientation to the *left* of Gonzales. Warden Strong discussed such configuration during the inspection visit. ████

███████████████  ████████████
███████████████████  ████████
      ████████████████████████
████████████████████████████
████████████████████  Regardless, the
ultimate location of the participants in the chamber
implicates TDCJ's asserted interest in maintaining line-of-
sight for the Warden, the medical team, and the witnesses
during the execution procedures. Their location also
implicates TDCJ's asserted interest in IV-line security.

2.  Legal standard

Trial has been continued. Dkt 90. But that doesn't
resolve the question of the impending execution date and,
specifically, whether TDCJ will violate Gonzales' rights by
carrying out his execution in the manner that it proposes.
Gonzalez thus moves for a tailored preliminary injunction
requiring TDCJ to allow his spiritual advisor to pray
vocally, touch his chest, and hold his hand if and when his
execution goes forward. Dkt 59. He doesn't ask for—and
the Court isn't considering—a stay of his execution date
separate and apart from accommodations that could allow
the execution to proceed.

The Supreme Court recently held that a "tailored
injunction" of the type sought here is potentially "the
proper form of equitable relief when a prisoner raises a
RLUIPA claim in the execution context," as opposed to "a
stay of execution." *Ramirez*, 142 S Ct at 1282. The overall
need, where appropriate, is to preserve the *status quo*
during pendency of the litigation. See *City of Dallas v Delta
Air Lines Inc*, 847 F3d 279, 285 (5th Cir 2017). As stated
by the Fifth Circuit, "The purpose of a preliminary
injunction is always to prevent irreparable injury so as to
preserve the court's ability to render a meaningful decision
on the merits." *Canal Authority of the State of Florida v
Callaway*, 489 F2d 567, 576 (5th Cir 1974).

A preliminary injunction is an "extraordinary remedy." *Byrum v Landreth,* 566 F3d 442, 445 (5th Cir 2009). A federal court may generally grant a preliminary injunction only on a movant's showing as to the familiar factors of (i) a substantial likelihood of success on the merits; (ii) a substantial threat of irreparable harm; (iii) the balance of equities tips in the applicant's favor; and (iv) an injunction is in the public interest. *Ramirez*, 142 S Ct at 1275. Once such findings are made, crafting a preliminary injunction is "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v International Refugee Assistance Project*, 137 S Ct 2080, 2087 (2017).

A court issuing a preliminary injunction must provide findings and conclusions that support its decision. FRCP 52; see also *Ali v Quarterman*, 607 F3d 1046, 1048 (5th Cir 2010); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (Westlaw 2022). But the preliminary injunction stage is less formal than trial, and the Supreme Court generally recognizes that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas v Camenisch*, 451 US 390, 395 (1981). A federal court may thus consider hearsay and similar evidence when deciding whether to enter a preliminary injunction. See *Sierra Club, Lone Star Chapter v FDIC*, 992 F2d 545, 551 (5th Cir 1993).

As such, certain materials submitted by Gonzales are proper for the limited purpose here, regardless of whether they're admissible for consideration on summary judgment or at trial. This includes a recent brief by *amicus curiae* before the United States Supreme Court, referred to here as *the Beckett Brief*. See Michael W. McConnell, et al, Brief for the Beckett Fund as Amicus Curiae, *Ramirez v Collier*, No 21-5592 (US Supreme Court, filed Sept 27, 2021), filed here at Dkt 40-1. This also includes two expert reports from Dr Mark J. S. Heath, a well-credentialed practicing anesthesiologist at Columbia University Medical Center in New York City—at least to the extent his opinions address

11

medical procedures within his learning and experience as an anesthesiologist, as opposed to broader opinions on security during executions that exceed his medical expertise. See Dkts 52 at 24–39 & 51-1 (report and supplement); see also Dkt 86 (order limiting consideration).

    3.   Analysis

Gonzales mentions his First Amendment claim in his motion for a preliminary injunction. Dkt 59 at 15. But he focuses almost exclusively on his claim under RLUIPA. His counsel at hearing on June 30th also conceded that the motion rises or falls on that statutory claim. As such, each preliminary injunction factor will be analyzed only in relation to the RLUIPA claim. The constitutional claim needn't be addressed.

    a.   Likelihood of success on merits

A plaintiff isn't required to prove "entitlement to summary judgment" to show a likelihood of success on the merits. *Byrum*, 566 F3d at 446. But the "plaintiff must present a prima facie case." *Daniels Health Sciences LLC v Vascular Health Sciences LLC*, 710 F3d 579, 582 (5th Cir 2013); see also *Doherty v National Board of Medical Examiners*, 791 F Appx 462, 464 (5th Cir 2019, *per curiam*).

Gonzales claims that denial of his ability to hold the hand of his spiritual advisor at the moment of his execution unlawfully limits observance of his personal faith and religious practices in violation of RLUIPA. Dkt 1 at ¶¶ 4, 20, 26 & 28–35. The pertinent statutory text provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of
> furthering that compelling governmental
> interest.

42 USC § 2000cc-1(a).

This textually puts four main points of inquiry at issue:

- o Whether the practice at issue and the attendant, requested accommodation implicates a *religious exercise* within the meaning of RLUIPA;
- o Whether the subject governmental policy imposes a substantial burden on the specified religious exercise;
- o If so, whether a compelling governmental interest supports the burden imposed; and
- o If so, whether that interest is being implemented by the least restrictive means.

Related to the first inquiry is another, implicit one:

- o Whether the complaining party is sincere in his observance of the subject religious practice and attendant request for accommodation.

See *Ramirez*, 142 S Ct at 1277; *Holt v Hobbs*, 574 US 352, 360–62 (2015); *Moussazadeh v Texas Department of Criminal Justice*, 703 F3d 781, 790 & 794–95 (5th Cir 2012).

RLUIPA requires a burden-shifting analysis. See 42 USC § 2000cc-2(b). The plaintiff must first show that the challenged government practice imposes a substantial burden on his religious exercise. If shown, "the burden shifts to the government to show that its action or policy is the least restrictive means of furthering a compelling interest." *Brown v Collier*, 929 F3d 218, 229 (5th Cir 2019) (cleaned up); see also *Holt*, 574 US at 360 & 362.

i. Religious exercise

RLUIPA defines *religious exercise* to mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 USC § 2000cc-5(7)(A).

Specification of the religious practice at issue must necessarily come from the complaining party.

Gonzales asserts that he's a Messianic Christian. Dkts 52 at 41 & 72-1. No explanation or definition of *Messianic Christianity* appears in the record. Its doctrinal texts (if any) aren't cited, although a few passages from the Bible are referenced. See Dkt 52 at 41–42; see also Dkt 40 at 7–8. And nothing from either an expert on this topic or Gonzales' own spiritual advisor explains what is, must, or might be preferences practiced by adherents to this faith.

But Gonzales has provided a declaration stating his own perspective and understanding. It states:

> I am a Messianic Christian. Over the years, I have completed various religious courses and obtained certificates for completing them. This includes correspondence study courses with Shalom Bible College.
>
> Reverend Bri-anne Swan is my spiritual advisor. I have requested that she be present in the chamber during my execution. As part of my religious beliefs, I have requested that she pray over me, hold one of my hands, and place her other hand on my chest over my heart during my execution.
>
> I have asked for this because it is important to my religious beliefs. Receiving God's touch is a sacred concept in the Bible and even the lepers were touched by God. The specific physical contact I have requested is vitally important to me as I am making my spiritual transition into the paradise of God. Allowing Reverend Swan to hold one of my hands and place her other hand over my heart will provide a sense of tranquility and she will serve as a representative of Christ in the physical

14

form in the execution chamber as I pass into God's Kingdom.

I am aware that TDCJ now states they will permit Reverend Swan to pray and place one hand over my heart, but that they will not permit her to hold my hand.

The specific contact locations that I have requested, the heart and hand, are deeply important to my religious beliefs. My spiritual needs will not be satisfied by allowing Reverend Swan to be in physical contact with other parts of my body or to only place a hand over my heart.

It is important to my religious beliefs for Reverend Swan to place a hand over my heart during my execution. The Bible tells us to believe in God with all of our heart. Spiritually, your heart is the most important organ. Having Reverend Swan place a hand over my heart as it stops beating is important because it will allow her, as Christ's representative in this world, to physically bear witness to my passing into the Kingdom of God.

It is equally important to my religious beliefs that she holds one of my hands during my execution. There is a long Biblical tradition about the importance of laying hands. In some instances, Jesus or his followers touched the hand of people they performed miracles on. Two examples of this are in Matthew Chapter 8, Verses 14–15 and Mark Chapter 5, Verse 41. Reverend Swan holding my hand is important to allow her to bless me as I transition into the Kingdom of God. Because Reverend Swan is God's representative on Earth, her holding my hand is as if God is holding my hand, in the

15

> same way that Jesus did for those in the Bible that He performed miracles on. Reverend Swan taking my hand as God's representative is like God welcoming me into His Kingdom as I pass.
>
> I also believe that I am God's repre-sentative on Earth. Being able to hold Reverend Swan's hand while I am passing allows me to physically feel the blessing she is providing me as I pass in a way that other contact would not.

Dkt 52 at 41–42.

The Bible mentions the holding and laying of hands as an important precept in some contexts. Gonzales notes two examples in his declaration above. His counsel expanded upon these references in briefing. See Dkt 40 at 7–8, citing Isaiah 41:13, Psalms 73:23–24 & Luke 8:54–55; see also Numbers 27:15–23, Deuteronomy 34:9, Acts 8:14–19, Acts 13:3 & 1 Timothy 4:14.

Recent briefing before the Supreme Court also sufficiently establishes for present purposes that the touch of clergy proximate to execution has historically been an important feature in American capital punishment. See Beckett Brief, Dkt 40-1 at 29–33. Historical and even most modern methods of execution—hanging, firing squad, electrocution, gas chamber, and the like—naturally precluded close proximity of clergy during the actual execution procedure. But "the adoption of lethal injection as a new execution method has allowed clergy touch even at the moment of death." Id at 31. And "government procedures since the advent of lethal injection evince a consistent practice of accommodating clergy touch." Ibid. States including Alabama, Louisiana, and South Carolina have conducted executions in which the spiritual advisor held the hand of the condemned inmate. Id at 33.

TDCJ intends to provide for touch by Gonzales' spiritual advisor, but it disputes that he can specify multiple points of contact for such touch. Regardless, it

16

accepts at face value that what Gonzales puts at issue here is, in fact, *religious exercise* within the meaning of RLUIPA. This was specifically confirmed as a concession at hearing on June 30th. As such, the accommodation sought by Gonzales—that his spiritual advisor both hold his hand while placing another hand over his heart at the moment of execution—must be deemed to meet the definition of *religious exercise* under RLUIPA.

      ii.   Sincerity

The Supreme Court instructs that a prisoner's requested accommodation "must be sincerely based on a religious belief and not some other motivation." *Holt*, 574 US at 360–61. The Fifth Circuit likewise observes that scrutiny into religious sincerity addresses the question of whether the adherent has "an honest belief that the practice is important to his free exercise of religion," which is "almost exclusively a credibility assessment." *Moussazadeh*, 703 F3d at 790 & 792 (cleaned up).

When contested, the issue depends strongly upon the specific facts of the case. The narrow question is whether the plaintiff personally believes that the desired religious practices are deeply important. See *Sossamon v Lone Star State of Texas*, 560 F3d 316, 332–33 (5th Cir 2009). This focus on personal belief means that inquiry into religious sincerity is constrained. Indeed, the Fifth Circuit requires district courts to exercise "judicial shyness" when addressing this question. *Betenbaugh v Needville Independent School District*, 611 F3d 248, 262 (5th Cir 2010).

It certainly isn't the place of federal, state, or local governments to dictate how religion should be practiced or to define who is and isn't devout. As observed by the Supreme Court, "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *United States v Ballard*, 322 US 78, 86 (1944). And so quite clearly, the inquiry isn't a decision on the truth or validity of the inmate's belief. The question instead is only whether the belief is "truly held." *United States v Seeger*, 380 US 163, 185 (1965). As such, sincerity is

"generally presumed or easily established." *Moussazadeh*, 703 F3d at 791.

TDCJ doesn't contest sincerity in either its motion for summary judgment or its response to Gonzales' cross-motion for summary judgment. See Dkts 42 & 48. This isn't surprising. Gonzales has provided a declaration about his request as set out above in pertinent part. Dkt 52 at 41–42. That statement is consistent with both his complaint in this action and the administrative grievances he initiated in 2021. See Dkts 1 at ¶ 20, 72-1 & 72-2. It's apparent from these documents that he personally places religious significance on having his spiritual advisor hold his hand.

TDCJ does put sincerity at issue in its response to the motion for a preliminary injunction, however, arguing that Gonzales is simply seeking expedient delay of his execution date. It notes that he didn't request a spiritual advisor's presence during two prior execution dates in 2016. And it observes that Gonzales only asked for a spiritual advisor after the executions of Patrick Murphy and Ruben Gutierrez were stayed based on similar requests. Dkt 66 at 3–4; see *Murphy v Collier*, 139 S Ct 1475 (2019); *Gutierrez v Saenz*, 141 S Ct 127 (2020).

That argument fails for two reasons. First, it misapprehends the narrow injunction sought by Gonzales. He doesn't request delay or postponement of any length. He simply requests that the State afford him the requested accommodations if the execution goes forward. True, that may implicate delay. But he doesn't request it outright.

Second, the argument strips Gonzales' request of proper context. The Supreme Court in *Ramirez* did note that "evolving litigation positions may suggest a prisoner's goal is delay rather than sincere religious exercise." 142 S Ct at 1278. But it then proceeded to consider the condemned inmate's allegedly evolving request in the context of equally evolving TDJC policy. See id at 1277–78. TDCJ policy prior to 2019 *required* the presence of a prison-employed chaplain in the execution chamber. See *Gutierrez v Saenz*, Civil Action No 19-cv-00185 (SD Tex), Dkt 124 at 3 (quoting former TDCJ policy). TDCJ later

*barred* all spiritual advisors from the execution chamber. It then *allowed* all spiritual advisors in the chamber (subject to background check and approval) but precluded audible prayer and touch. See *Ramirez*, 142 S Ct at 1273–74 (detailing evolution of TDCJ policy). And only with *Ramirez* has specification of certain practices in which spiritual advisors may engage come into focus.

Given these fluctuations in policy, the fact that Gonzales didn't request the exact same spiritual assistance in 2016 doesn't necessarily compromise his sincerity now. And the current record provides no serious reason to doubt Gonzales, especially given that he doesn't seek attendant delay. Indeed, the Fifth Circuit in other contexts has accepted religious sincerity "on little more than the plaintiff's credible assertions." *Tagore v United States*, 735 F3d 324, 328 (5th Cir 2013).

Gonzales has made the requisite *prima facie* showing that the requested religious practices are deeply important to him as a subjective matter.

### iii.   Substantial burden

The central dispute between the parties is whether Gonzales has shown a substantial burden on his religious exercise. The plaintiff bears the initial burden of proof in a RLUIPA case to establish that the prison policy substantially burdens his religious exercise. *Holt*, 574 US at 360. But that burden is borne in a context where RLUIPA has granted "expansive protection for religious liberty," affording an inmate with "greater protection" than is available under the First Amendment. Id at 358 & 361.

A government practice imposes a *substantial burden* on religious exercise where it "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v Kaspar*, 393 F3d 559, 569–70 (5th Cir 2004). A violation is *significant* in this regard when it either "influences the adherent to act in a way that violates his religious beliefs" or "forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and,

19

on the other hand, following his religious beliefs." Id at 570. By contrast, a government practice imposes no substantial burden "if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not generally allowed." Ibid.

This typically is a fact-intensive inquiry that requires a case-by-case analysis. *Turner v Texas Department of Criminal Justice*, 836 F Appx 227, 230 (5th Cir 2021, *per curiam*), citing *Adkins*, 393 F3d at 571. But requests for religious accommodation in other contexts provide a helpful comparison. For example, it's beyond contest that dedication to daily and weekly congregation for prayer and other religious activities is deeply important to the practice of many adherents to the Jewish faith. See *Baranowski v Hart*, 486 F3d 112, 124 (5th Cir 2007). The Fifth Circuit holds under RLUIPA that the failure to provide unfettered opportunities to congregate doesn't necessarily impose a substantial burden. See id at 124–25, citing *Adkins*, 393 F3d at 569–70. But even so, it also strongly suggests that a policy affirmatively prohibiting such congregation would do so. See *Adkins*, 393 F3d at 571.

Gonzales here requests that his execution proceed with his spiritual advisor simultaneously touching his chest and holding his hand. He addresses this with considerable specificity in his declaration. He there states, "The specific contact locations that I have requested, the heart and hand, are deeply important to my religious beliefs." Dkt 52 at 41. He continues, "My spiritual needs will not be satisfied by allowing Reverend Swan to be in physical contact with other parts of my body or to place a hand over my heart." Ibid. He also explains the religious importance of his belief, linking it to his hoped-for transition into the Kingdom of Heaven and a feeling of blessing as he passes into the next life. Id at 41–42.

TDCJ acknowledges that the prohibition on hand-holding imposes a burden. It simply argues that the burden isn't substantial enough to warrant RLUIPA's protections. And this proceeds from argument by which it generalizes

and re-interprets Gonzales' request as simply one for physical contact—which it is willing to accommodate by allowing the spiritual advisor to place a hand over Gonzales' heart. Dkt 66 at 4–5. It concludes, "The accommodations granted by TDCJ may not completely satisfy Gonzales's desires, but they satisfy the religious significance of the ritual Gonzales has requested to occur during his execution." Dkt 42 at 10.

But as noted above, TDCJ neither challenges Gonzales' specification of his requested religious practices nor contests his sincerity in that regard on the merits. Those concessions ultimately doom contention directed to the substantiality of the burden imposed. It simply isn't for this Court or TDCJ to tell Gonzales what religious practices are important to him or how they are satisfactorily observed. Indeed, decision by the Supreme Court in *Holt v Hobbs* entirely forecloses TDCJ's argument on this point.

At issue in *Holt* were religious practices of the Muslim faith. Specifically, the grooming policy of the Arkansas Department of Corrections prohibited a Muslim inmate from growing his beard. 574 US at 355–56. In a unanimous opinion by Justice Alito, the Supreme Court readily concluded, "If petitioner contravenes that policy and grows his beard, he will face serious disciplinary action. Because the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise." Id at 361.

Here, Gonzales isn't even put to the choice. He instead has no say at all as to whether he can hold hands with his spiritual advisor. And it matters not that TDCJ has already made accommodations of other religious requests by affording Gonzales the presence and audible prayer of his spiritual advisor as she lays one hand over his heart. For *Holt* also disposed of any such contention in that regard. The question, said the Supreme Court, is whether there's a substantial burden on the specific religious exercise, "not whether the RLUIPA claimant is able to engage in other forms of religious exercise." Id at 361–62. And so the Supreme Court found it insufficient that the inmate had already been provided a prayer rug, the ability

to maintain the required diet, and the freedom to observe Islamic holidays and access religious advisors in accordance with his faith. For none of those addressed the additional requirement as to his beard. Ibid.

Gonzales has precisely described how he would like to practice his religion in his final moments—and that includes his hand as a point of contact with his spiritual advisor. As noted above, TDCJ puts neither that practice nor the sincerity of his belief in it at issue here. Yet it states intention to expressly prohibit that specific, requested accommodation. Such an outright ban is necessarily a substantial burden within the meaning of RLUIPA.

A number of authorities support such conclusion. When on the Tenth Circuit, then-Judge Gorsuch wrote that "flatly prohibiting" an inmate "from participating in an activity motivated by a sincerely held religious belief" imposes a substantial burden. *Yellowbear v Lampert*, 741 F3d 48, 56 (10th Cir 2014). The Fifth Circuit similarly held in *Merced v Kasson* that "the government's ban of conduct sincerely motivated by religious belief substantially burdens an adherent's free exercise of that religion." 577 F3d 578, 590 (5th Cir 2009). The Ninth Circuit succinctly stated in *Greene v Solano County Jail* that "an outright ban on a particular religious exercise is a substantial burden on that religious exercise." 513 F3d 982, 988 (9th Cir 2008). And recent decision by the Supreme Court in *Ramirez* is in accord. 142 S Ct at 1278.

Gonzales has for present purposes sufficiently shown a substantial burden on his religious exercise.

    iv.   Compelling governmental interests

As to defining a *compelling governmental interest* in the religious-exercise context, the Supreme Court stresses, "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v Yoder*, 406 US 205, 215 (1972). The Supreme Court and the Fifth Circuit have both returned to this articulation in recent

years. See *Fulton v City of Philadelphia*, 141 S Ct 1868, 1881 (2021); *McAllen Grace Brethren Church v Salazar*, 764 F3d 465, 472 (5th Cir 2014). The Fifth Circuit has likewise observed in this context, "In this highly sensitive constitutional area, only the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Combs v Central Texas Annual Conference of the United Methodist Church*, 173 F3d 343, 346 (5th Cir 1999) (cleaned up).

The burden is on the government "to demonstrate that its policy 'actually furthers' a compelling interest when applied to 'the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Tucker v Collier*, 906 F3d 295, 302–03 (5th Cir 2018), quoting *Holt*, 574 US at 363–64. Indeed, the Supreme Court instructs that courts "cannot rely on broadly formulated governmental interests," but rather must scrutinize "the asserted harm of granting specific exemptions to particular religious claimants." *Mast v Fillmore County*, 141 S Ct 2430, 2432 (2021) (Gorsuch, J, concurring), quoting *Fulton*, 141 S Ct at 1881, in turn quoting *Gonzales v O Centro Espirita Beneficente Uniao do Vegetal*, 546 US 418, 431 (2006) (cleaned up).

TDCJ articulates three compelling governmental interests furthered by the denial of the accommodation requested by Gonzales. First, the denial ensures that the Warden (in personal proximity to the condemned inmate) and the medical team (observing behind a one-way mirror in an adjacent room) can see each other as they constantly monitor the IV lines in the Gonzales' arms. Second, it protects the IV lines from intentional or unintentional interference. Third, it preserves the ability of various witnesses to observe the execution without obstruction, with Gonzales also having an unobstructed view of these witnesses should he choose to address them in his last words. Dkt 66 at 5; see also Dkt 42 at 11–15.

These interests are similar to those articulated by Texas and recognized by the Supreme Court in *Ramirez*— "preventing disruptions of any sort," "preventing

accidental interference with the prison's IV lines," and "protecting those attending an execution." 142 S Ct at 1280–81. And the Supreme Court has elsewhere instructed district courts considering RLUIPA claims in the prison context to be mindful of the underlying need to maintain order and safety when addressing a prisoner's request for religious accommodation. For instance, writing for a unanimous Supreme Court, Justice Ruth Bader Ginsburg explained at length the special interests present in the context of a RLUIPA claim:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Cutter v Wilkinson*, 544 US 709, 722–23 (2005) (cleaned up).

Gonzales concedes that these articulated interests are compelling, at least "in a general sense." Dkt 51 at 26; see also Dkt 59 at 20. But he argues that they aren't compelling in these circumstances in light of other accommodations already required of or voluntarily made by the State. Dkt 51 at 26. This argument tracks pronouncement by the Fifth Circuit that compelling interests must be analyzed in their application to the particular claimant. *Ali v Stephens*, 822 F3d 776, 785 (5th Cir 2016), quoting *Holt*, 574 US at 363. It's also in line with Fifth Circuit authority noting

that a "law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the inference that the government's claimed interest isn't actually so compelling after all." Ibid, quoting *Yellowbear*, 741 F3d at 60 (cleaned up).

To the extent Gonzales argues that the compelling interests aren't implicated by his specific request—which at least in certain respects merges the compelling-interest and least-restrictive-means tests—that contention will be taken into consideration with respect to that latter test. But for present purposes, TDCJ has sufficiently identified legitimate compelling governmental interests attendant to the execution process.

v.   Least restrictive means

The Fifth Circuit holds that *least restrictive means* "has its plain meaning." *Sossamon*, 560 F3d at 332. It requires the government to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Burwell v Hobby Lobby Stores Inc*, 573 US 682, 728 (2014). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S Ct at 1881.

This is "the most demanding test known to constitutional law." *City of Boerne v Flores*, 521 US 507, 534 (1997). Courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Chance v Texas Department of Criminal Justice*, 730 F3d 404, 410 (5th Cir 2013), quoting *Cutter v Wilkinson*, 544 US 709, 723 (2005) (cleaned up); see also *O'Lone v Estate of Shabazz*, 482 US 342, 349 (1987). But they may not simply "assume a plausible, less restrictive alternative would be ineffective." *United States v Playboy Entertainment Group Inc*, 529 US 803, 824 (2000). As aptly and recently summarized by Justice Gorsuch, "RLUIPA prohibits

governments from infringing sincerely held religious beliefs and practices except as a last resort." *Mast*, 141 S Ct at 2433 (Gorsuch, J, concurring).

In short, the burden is on the government to affirmatively establish that alternatives to its chosen course—here, the outright denial of Gonzales' request that his spiritual advisor hold his hand during his execution—are ineffective. *Ali*, 822 F3d at 786.

TDCJ points to the least-restrictive-means analysis in the *Ramirez* decision itself. Dkt 66 at 5. The Supreme Court there stated that TDCJ "could require [the condemned inmate's] pastor to stand in a location that gives the medical team an unobstructed view of the IV lines, allowing them to watch for problems and quickly respond." *Ramirez*, 142 S Ct at 1281. It also said that TDCJ could protect the IV lines by allowing "touch on a part of the body away from IV lines, such as a prisoner's lower leg." Ibid. TDCJ notes that it has already made significant changes to accommodate Gonzales' wishes after studying the layout of the chamber and the necessary procedure. As such, it contends, "TDCJ officials have accommodated more than the Supreme Court suggested would be necessary by allowing the spiritual advisor to stand at the end of the gurney and touch Gonzales's chest." Dkt 42 at 15–16. And it asserts that its "substantial accommodation leaving only a restriction on the spiritual advisor's right-hand placement demonstrates TDCJ's use of an alternative that is the least restrictive." Id at 16.

The problem with this argument is that it actually avoids—rather than addresses—the least-restrictive-means analysis. That TDCJ has already done *something* doesn't mean that it has done the requisite *least-restrictive thing*. Plausible alternatives aren't discussed, much less discounted. And importantly, the condemned inmate in *Ramirez* requested only spiritual touch in a general sense. See *Ramirez v Collier*, Civil Action No 21-cv-02609 (SD Tex), Dkt 1 at ¶ 3. That's different than the specific requests made by Gonzales here.

TDCJ does discuss in practical terms certain reasons why it couldn't position the execution participants or conduct the execution in another manner to comply with Gonzales' request. It argues that holding Gonzales' hand and touching his chest from the spot where his spiritual advisor is now designated to stand wouldn't be physically possible—the reach is too far. Dkt 42 at 19. And it contends that moving the spiritual advisor would block the viewing ability of the Warden, the injection team, or the witnesses. Id at 19–20. It might also threaten the security of the IV lines, which—upon related contention—TDCJ says will likely be inserted into the arms or top of the hands in order to access the most effective and suitable veins for lethal injection. Id at 21–23.

But again, the problem with the argument is that it avoids—rather than addresses—the least-restrictive-means analysis. Least-restrictive means analysis requires the government to exhaust *every* plausible alternative, not just *some* of those alternatives.

Both arguments also fail to address the issue of *underinclusiveness* noted above. Where a policy is underinclusive, "the prison must provide an adequate explanation for its differential treatment." *Ware v Louisiana Department of Corrections*, 866 F3d 263, 269 (5th Cir 2017) (cleaned up). Among other ways, a prison may rebut allegation of underinclusiveness "by showing that it hasn't acted in a logically inconsistent way—by (say) identifying a qualitative or quantitative difference between the particular religious exemption requested and other . . . exceptions already tolerated." *Ali*, 822 F3d at 787, quoting *Yellowbear*, 741 F3d at 61 (cleaned up). Simply put, TDCJ hasn't rebutted the assertion that allowing the spiritual advisor to hold Gonzales' hand presents any appreciable risk to the security of the IV lines beyond the accommodations already allowed that place her adjacent to him with a hand over his heart. Indeed, the presence of the OIG officer in the chamber beside the spiritual advisor is precisely to mitigate that risk.

TDCJ also hasn't excluded other potential solutions that might allow the requested accommodation, as is its burden. And two plausible and less-restrictive alternatives to outright denial appear to exist. One pertains to placement of the spiritual advisor. The other pertains to placement of the IV lines.

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

████████ Refer to the diagram above. Such position is neither in front of any viewing window nor in the line of sight of the Warden's intended location. This was quite apparent from the Court's visit to the execution chamber. True, this places the spiritual advisor in closer proximity to the IV lines, at least in the sense that ████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████ ███ ██████ █████ ████ ██████
███████████████████████████████████
███████████ ████ But TDCJ hasn't—as is its burden— explained why those lines also can't be sufficiently secured or that they pose the risk that it asserts.

It seems apparent that a sufficient screen or barrier to any exposed length of the IV lines could be installed—or at least, TDCJ hasn't met its burden to explain why that's not possible. And putative cost in that respect isn't an issue, as RLUIPA expressly anticipates that "this chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 USC § 2000cc-3(c). Likewise important is the finding by the Supreme Court in *Holt* that the prison system there failed to show why the requested accommodation at issue (facial hair in conformance with the Muslim faith) couldn't be implemented where the evidence showed that "many institutions" allowed it. 574 US at 367; see also id at 368–69. So, too, here, given that other States have allowed inmates to hold hands with

a spiritual advisor. See Beckett Brief, Dkt 40-1 at 33 (citing examples from Alabama, South Carolina, and Louisiana); see also Dkt 29 at 11–12.

*As to placement of the IV lines,* it seems apparent from inspection of the execution chamber that IV lines located to Gonzales' legs or lower body would place those lines quite a distance from the location of his spiritual advisor if she is to place a hand over his heart, hold his hand, and pray audibly as the execution proceeds. But TDCJ doesn't explain why such veins simply aren't suited to the task. If that was in fact the case, it would be easy enough to have an expert anesthesiologist so opine.

To the contrary, the execution protocols of Texas don't themselves require location of the IV lines to the crook of the arm. Those procedures instead provide as follows:

> A medically trained individual shall insert intravenous (IV) catheters into a suitable vein of the inmate. If a suitable vein cannot be discovered in an arm, the medically trained individual shall substitute a suitable vein in another part of the body but shall not use a "cut-down" procedure to access a suitable vein.

Dkt 72-3 at 10.

This expresses no more than a preference for a "suitable vein" in the arm. But it plainly provides that such may also be found "in another part of the body." That's unambiguous. And even if there existed some question, proper construction of the word *suitable* as used in the execution protocols must include not only medical suitability, but also conformance to RLUIPA requirements.

To be clear, TDCJ briefing shows that prison administrators have given serious thought to the execution process and made efforts to reduce risk and unknowns. Also commendable is TDCJ's apparent responsiveness to the dictates of the law as developed in recent RLUIPA decisions by the Supreme Court and the Fifth Circuit. But RLUIPA doesn't permit "unquestioning deference" to

TDCJ's preferences. *Holt*, 574 US at 364. The inquiry instead requires TDCJ "not merely to *explain* why it denied the exemption but to *prove* that denying the exemption is the least restrictive means of furthering a compelling governmental interest." Ibid (emphasis added). And so, while courts must respect that prison officials "are experts in running prisons and evaluating the likely effects of altering prison rules," such respect "does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard." Ibid.

As such, the present record doesn't support the contention that TDCJ has adopted the least-restrictive means of meeting its compelling governmental interests. And with that, Gonzales has made a *prima facie* showing of a substantial likelihood of success on the merits of his RLUIPA claim.

### b. Other considerations

None of the other pertinent factors counsel against issuance of a preliminary injunction on the terms requested here by Gonzales. Again, it's important to emphasize that he asks not for a stay or discontinuance of his execution, but only that a specific accommodation be made if the execution proceeds as scheduled.

*As to irreparable injury,* the Fifth Circuit holds in capital cases that "the possibility of irreparable injury weighs heavily in the movant's favor, especially when his claim has some merit." *Battaglia v Stephens*, 824 F3d 470, 475 (5th Cir 2016) (cleaned up); see also *Gutierrez v Saenz*, 818 F Appx 309, 314 (5th Cir 2020, *per curiam*), vacated on other grounds, 141 S Ct 1260 (2021). It's not hard to understand why. Gonzales argues that his death will "be permanent," and so, if TDCJ refuses his requested accommodation, it will irrevocably prevent him from engaging in "protected religious exercise in the final moments of his life." Dkt 59 at 24. This is a context within which monetary damages aren't—and cannot be—an adequate remedy. See *Ramirez*, 142 S Ct at 1282.

TDCJ argues that Gonzales won't suffer irreparable injury from the denial of his spiritual advisor holding his hand because she will still be present with him, praying audibly with a hand on his chest. Dkt 66 at 6. This simply recasts its arguments from above as to whether the refused accommodation constitutes a substantial burden. *Ipse dixit* argument that no violation will occur isn't helpful to the preliminary-injunction analysis as to irreparable injury where a likely violation—and attendant harm—has already been determined.

Gonzales has throughout this lawsuit consistently attributed religious significance to the holding of his hand by his spiritual advisor. For example, see Dkts 1 at ¶ 20, 52 at 41–42, 72-1 & 72-2. Those religious beliefs are his own, and he credibly says his beliefs require a particular practice. The recent observations by the Supreme Court in *Ramirez* pertain equally here. Gonzales "is likely to suffer irreparable harm in the absence of injunctive relief because he will be unable to engage in protected religious exercise in the final moments of his life." 142 S Ct at 1282.

*As to the balance of equities between the parties,* TDCJ objects to an injunction because it will delay the execution of Gonzales, forestalling finality in the enforcement of criminal sanctions under Texas law. It also notes that delay will impact the closure that the victim's family deserves. Dkt 66 at 6.

Such interests are without question important, but they aren't implicated here. This is so because Gonzales seeks a narrowly tailored injunction—not a stay of his execution date. In that sense, he doesn't oppose his execution going forward. He only requests that it go forward with observance of his requested religious accommodations. And it's already been determined that his execution can more than likely go forward in a manner respecting those requests while meeting the compelling governmental interests of Texas. Indeed, the Supreme Court in *Ramirez* found that the balance of equities favored the condemned inmate seeking a similar injunction. See 142 S Ct at 1282.

31

*As to the public interest,* the consideration runs both ways. The public has an interest in the enforcement of criminal laws and specifically "in timely enforcement of the death sentence." *United States v Vialva*, 976 F3d 458, 462 (5th Cir 2020). Principles of comity, federalism, and the finality of judgments also suggest caution when considering federal intrusion into the state criminal process and the enforcement of its judgments.

But Congress with RLUIPA stated a countervailing interest requiring preservation of religious liberties whenever possible. As stated by the Supreme Court, "Congress determined that prisoners . . . have a strong interest in avoiding substantial burdens on their religious exercise, even while confined." *Ramirez*, 142 S Ct at 1282. And so courts have recognized that preventing RLUIPA violations "is in the public interest and tips the balance of harms in the plaintiff's favor." *Smith v Commissioner*, 844 F Appx 286, 294 (11th Cir 2021). This is consonant with the broad rule of construction mandated by Congress in favor of assertions of religious liberty: "This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 USC § 2000cc-3(g).

4.   Conclusion

This ruling doesn't resolve the merits of the claims pending in this action. Trial has been continued by separate order. Dkt 90. And still pending are motions for summary judgment brought by the parties. Dkts 40 & 42. But the standards necessary to obtain the requested preliminary injunction have been met.

The motion by Plaintiff Ramiro Felix Gonzales for a preliminary injunction is GRANTED. Dkt 59.

A preliminary injunction will be ENTERED compelling Defendants as follows:

The State of Texas may proceed with the execution of Ramiro Felix Gonzales on July 13, 2022, only if Defendants Bryan Collier (as Executive Director of the Texas

Department of Criminal Justice), Bobby Lumpkin (as Director of the Texas Department of Criminal Justice—Correctional Institutions Division), and Dennis Crowley (as Warden of the Huntsville Unit, including any successor) permit his spiritual advisor, Reverend Bri-anne Swan, to hold his hand, place a hand on his chest, and audibly pray during and at the time of execution in accordance with the tenets of his religion.

For the avoidance of doubt, the Texas Department of Criminal Justice may not proceed with the execution of Ramiro Felix Gonzales on July 13, 2022, if for any reason it decides not to permit any part of these specified religious accommodations.

This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm. 18 USC § 3626(a)(2).

A separate order of preliminary injunction will issue in conjunction with this Opinion and Order. TDCJ retains discretion under RLUIPA to avoid the preemptive force of this injunctive relief "by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden." 42 USC § 2000cc-3(e).

SO ORDERED.

Signed on July 5, 2022, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

33